**UNITED STATES of America,
Plaintiff,**

v.

**James REDEMANN, Defendant.**

No. 03–CR–71.

United States District Court,
E.D. Wisconsin.

Dec. 4, 2003.

Scott J. Campbell, Milwaukee, WI, for Plaintiff.

Dean A. Strang, Milwaukee, WI, for Defendant.

## MEMORANDUM

ADELMAN, District Judge.

## I. FACTS AND BACKGROUND

In 1979, Jeffrey Dahlman became a bank examiner for the State of Wisconsin. One of the banks he was assigned to exam-

ine was Farmer's State Bank located in Poy Sippi, Wisconsin. After examining the bank in 1983, Dahlman purchased it through a holding company he controlled called Evergreen of Wisconsin. Dahlman then changed the name of the bank to Evergreen Bank and installed himself as its President and CEO.

In 1993, Dahlman and his wife Dawn began stealing money from the bank in order to finance their lavish lifestyle. They used bank funds to pay for country club memberships, automobiles, a boat and boat accessories, jewelry, property taxes on their Florida home, credit card bills, lawn care, a nurse for Dahlman's grandfather, and the salaries of employees at another business they owned. Dahlman ended up taking almost $4,000,000 from the bank.

Dahlman's conduct was brazen, but he did devise a scheme to conceal his looting of the bank. James Redemann, the defendant in this case, was a local contractor. Dahlman hired defendant to perform repairs and renovation work on the bank, and the two men developed a friendship. Dahlman enlisted defendant into his scheme as follows: (1) Dahlman used Evergreen money orders to pay personal expenses as discussed above; (2) after totaling the personal expenses, Dahlman instructed defendant to submit inflated invoices for the construction work he had performed on the bank, which contained both defendant's legitimate expenses and the amount Dahlman had stolen; (3) Dahlman would then pay the invoice with a money order; (4) defendant would endorse the money order back to the bank; and (5) the proceeds would be used to pay defendant both for his work and additional sums to which he was not entitled (through a deposit to his checking account), and to cover the money orders Dahlman had used for personal expenses. The transaction was then "booked" as an addition to the bank's fixed asset (bank premises) account.

Examiners from the Office of the Comptroller of Currency (OCC) caught up with Dahlman in April 1998. Defendant attempted to obstruct the OCC investigation by hiding copies of money orders in the attic of the bank, but the scheme was nevertheless discovered. Dahlman pled guilty to bank fraud and was sentenced to 63 months in prison. His wife Dawn got five months in prison.

In August 1999, the OCC commenced a civil enforcement action against defendant Redemann, extracting a $75,000 penalty and $100,000 restitution obligation. Defendant was also permanently barred from participating in the affairs of a financial institution regulated by the OCC or Federal Reserve. The government then charged defendant with conspiracy to commit bank fraud and to obstruct the examination of a financial institution. Defendant pled guilty to both counts and the case proceeded to sentencing. The parties agreed that defendant's offense level under the sentencing guidelines was 15 and his criminal history category was I, producing an imprisonment range of 18–24 months.[1] How-

1. The parties agreed that the appropriate base offense level was 6 under U.S.S.G. § 2F1.1(a), plus 12 for amount of loss under § 2F1.1(b)(1)(M), plus 2 for more than minimal planning under § 2F1.1(b)(2), plus 2 for obstruction of justice under § 3C1.1, minus four for minimal role in the offense under § 3B1.2(a), and minus three for acceptance of responsibility under § 3E1.1, for a total offense level of 15. The obstruction count was grouped pursuant to § 3D1.2. Defendant had no criminal record so his criminal history category was I. Because defendant's offenses concluded in 1998, the parties agreed to use the 1998 version of the guidelines because it was more favorable to defendant than the current version, which would have required a 16 level enhancement for amount of loss. *See* U.S.S.G. § 2B1.1(b)(1)(I) (2003).

ever, defendant moved for a downward departure on two cumulative bases—(1) extraordinary family circumstances and (2) the previous satisfaction of most of the purposes of sentencing. Upon reviewing the PSR, I also advised the parties that I was considering a departure because the amount of loss attributed to defendant substantially overstated the seriousness of his offense, *see* U.S.S.G. § 2F1.1 cmt. n. 8(b) & 11 (1998), and provided an opportunity for the parties to brief the issue, which they did.

Upon consideration of the briefs and arguments of counsel, I decided to depart downward by two levels. In this memorandum, I explain the basis for my decision.

## II. DISCUSSION

### A. Departure Standard

The court may depart from the guidelines if it finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. U.S.S.G. § 5K2.0 (citing 18 U.S.C § 3553(b)) (1998). The Sentencing Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "discouraged" bases for departure, and "encouraged" bases for departure. *Koon v. United States,* 518 U.S. 81, 93–95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

The Supreme Court has adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden departures based on those factors? (3) If not, has the Commission encouraged departures based on those factors? (4) If not, has the Commission discouraged departures based on those factors? *Id.* at 95, 116 S.Ct. 2035.

If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (internal citations and quote marks omitted).

■ Before addressing defendant's motion, I first considered whether recent amendments to the sentencing statutes and guidelines adopted as part of, or pursuant to, the Prosecutorial Remedies and Tools Against the Exploitation of Children Today ("PROTECT") Act of 2003, Pub.L. 108–21, 117 Stat. 650 (2003), applied in this case. The Seventh Circuit has held that the new appellate standard of review[2] adopted in § 401(d) of the PROTECT Act

---

**2.** The new standard requires appellate courts to review de novo the district court's application of the guidelines to the facts when the district court departed from the guidelines. PROTECT Act of 2003 § 401(d)(2), 18 U.S.C. § 3742(e). Before the PROTECT Act, appellate courts reviewed departure decisions for an abuse of discretion. *Koon,* 518 U.S. at 98–100, 116 S.Ct. 2035.

applies to appeals considered after the Act's effective date, and that the Ex Post Facto Clause is not offended by its application in cases in which the crime was committed prior to the Act's effective date. *United States v. Mallon,* 345 F.3d 943, 946–47 (7th Cir.2003).

However, the application of guideline amendments adopted after commission of the offense that forbid or restrict grounds for departure would be a different matter. In *United States v. Seacott,* 15 F.3d 1380, 1386 (7th Cir.1994), the court held that "a guideline amendment which occurs after the commission of the defendant's crime which works to the defendant's detriment is inapplicable because it is a violation of the ex post facto clause." There is no meaningful distinction between guideline provisions which increase a defendant's imprisonment range and those which block a judge from departing to reduce that range. Thus, I did not consider the recent amendments to the guidelines in deciding whether to depart on the grounds specified. *See United States v. Lester,* 268 F.Supp.2d 514, 515 n. 2 (E.D.Pa.2003) (concluding, with government's agreement, that PROTECT Act did not apply to downward departure motion before district court). This is consistent with the so-called "one-book rule" contained in U.S.S.G. § 1B1.11(b)(2) (stating that court should use applicable guidelines manual in its entirety). However, as I noted at sentencing, because the specific grounds for departure at issue in the present case were not prohibited by the October 2003 amendments, my decision would have been the same even if those amendments did apply.

## B. Defendant's Motion

### 1. Family Circumstances

■ Defendant first argued that his family situation warranted a departure. Section 5H1.6 of the guidelines provides that family ties and responsibilities are not ordinarily relevant in determining whether a sentence should be outside the guideline range. Thus, this is a disfavored basis for departure, and the court may rely upon it to depart only if the defendant's situation is unusual or extraordinary. *See, e.g., United States v. Canoy,* 38 F.3d 893, 907 (7th Cir.1994); *United States v. Norton,* 218 F.Supp.2d 1014, 1018 (E.D.Wis.2002).

■ There are three main considerations in departures under § 5H1.6. First, the court must consider the specifics of the defendant's family situation—how many dependants does he have; what is his role in their lives; do they have special needs; are there others available to fill the void should the defendant go to prison. *Norton,* 218 F.Supp.2d at 1019; *see also United States v. Rivera,* 994 F.2d 942, 948 (1st Cir.1993) (Breyer, J.).

■ Second, the court should consider whether the guideline range is such that a reasonable departure would spare the defendant's family from unnecessary hardship. A departure cannot be justified when, even with the reduction, the sentence is so long that the defendant's release will come too late to assist the family. *Norton,* 218 F.Supp.2d at 1020 (citing *United States v. Wright,* 218 F.3d 812, 815–16 (7th Cir.2000)).

■ Third, the court should consider the purposes of sentences—the need for just punishment, protection of the public, general and specific deterrence, and rehabilitation of the defendant. *Id.* If the nature of the offense and the character of the defendant tend to show that no end other than punishment will be served by the term of imprisonment set by the guidelines, if there is no threat to the community, and if society will ultimately benefit by allowing the defendant to care for his family, a departure may be proper. *Id.*

Defendant, 52 years old at the time of sentencing, married his wife Christine in 1974. They had four children. Melanie, age 27, has two small children and suffers from Crohn's disease. Jocelyn is age 23 and recently moved to Colorado with her husband, a minister. Amber, age 19, is a college student and recently began abusing illegal drugs. Jeremiah, or JJ, is 18 and recently began college.

On December 6, 1999, defendant's wife died suddenly at age 46. The cause of death was deemed to be heart arrhythmia resulting from complications of a fever. It is believed that the stress of the criminal investigation into defendant's conduct contributed to her ill health.

Defendant argued that his situation was unusual for several reasons. First, his wife died during the pendency of the investigation into this matter, for which he blames himself. Second, his daughter Amber has been abusing drugs, and defendant has been her greatest source of support in fighting her addiction. Defendant assists her emotionally and financially with education and treatment costs. JJ relies upon defendant financially. Melanie relies upon defendant for babysitting and emotional support. Due to her health problems and financial constraints, Melanie is unable to assist her siblings as defendant does. Jocelyn is too far away to help. Defendant indicates that there are no other relatives who can assist. He is estranged from one brother, another suffers mental illness and lives in a residential facility, and a third lives far away and is financially unable to help. Defendant's mother is elderly and lives on a fixed income.

Defendant stated that with a five level departure he would move into Zone B of the sentencing grid and could receive a sentence of probation and home confinement. He noted that there was just a six month gap between the 18 month sentence he faced under the guidelines and the 12 month home confinement sentence the court could impose with the departure.

Finally, defendant argued that the purposes of sentencing would be served by a departure. His offense was non-violent, not drug related, and he played a minimal role in it. He has no prior record and poses no danger to society. The substantial adverse publicity he received during the investigation of the offense and the loss of his wife have already provided punishment and will act as a deterrent to future misconduct. Defendant also noted that by departing and imposing a sentence of probation he could continue to work and make payments towards the substantial restitution and civil penalties he owes. Imprisoning him would also harm his business.

These circumstances were not extraordinary. First, none of defendant's four children remain at home. The oldest two, Melanie and Jocelyn, are married and live completely on their own. While defendant is undoubtedly an important figure in their lives and the lives of his grandchildren, I could not conclude that the harm caused by defendant's absence would exceed in kind or degree that of other children and grandchildren of those incarcerated. *See United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999) (stating that to support departure harm to children must be greater than harm to children in typical case).

The youngest two children, Amber and JJ, are in college. While defendant is undoubtedly an important source of financial support for Amber and JJ, there was no indication that they would be forced to drop out of school without his help in paying tuition or that other sources such as loans or financial aid were unavailable. Defendant indicated that Amber is battling a drug problem. However, I could not conclude that this was an unusual or extraordinary circumstance, or that Amber's

siblings and grandmother could not offer her the emotional support necessary to obtain professional help for her problems, or that defendant's presence was essential to her drug treatment. *Cf. id.* (stating that professionals could deal with child's learning problems, perhaps more effectively than parent).

Second, it would have required a considerable departure—five levels—to allow a sentence of probation and home confinement. To the extent that defendant's family circumstances merited some consideration, they could not sustain a departure of that extent. Therefore, although I was authorized to depart on this basis, I declined to exercise my discretion to do so.

## 2. Satisfaction of Purposes of Sentencing

■ Defendant's second basis for departure was that the purposes of sentencing had already been satisfied. He relied primarily on *United States v. Gaind,* 829 F.Supp. 669 (S.D.N.Y.1993), *aff'd,* 31 F.3d 73 (2d Cir.1994). In that case, the defendant was convicted of making false statements in connection with contracts that he had, through his business, obtained with the EPA. The defendant's business was effectively destroyed by the discovery of his crime. *Id.* at 670. The court departed downward, stating:

> In the present instance, the destruction of the defendant's business has already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process. Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and

> constitutes a source of both individual and general deterrence. Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior.

> Because of the destruction of the defendant's testing business, the necessity for achieving the purposes of sentencing through sentencing itself has been reduced. The Sentencing Guidelines do not consider the situation presented by complete presentence destruction of a major business previously owned and operated by the defendant as a result of discovery of the crime, where this destruction achieves in part the purposes of the sentence itself.

> Under such circumstances 18 U.S.C. § 3553(a) controls through its requirement that the "court shall impose a sentence sufficient, but not greater than necessary" to the defined objectives, and § 3553(b) requires me to depart downward from the Guidelines.

*Id.* at 671.

Defendant argued that his case was similar. After local media began reporting on the government's investigation into his activities with Evergreen Bank, he suffered tremendously in both his personal and professional relationships. Defendant had lived his entire life in the small town of Fremont, Wisconsin, and people he had known for years began ignoring him on the streets. His children were taunted in school, to the point where his daughter Amber was forced to transfer to another high school. His wife became ill and died suddenly. Defendant relied heavily on his reputation and good will to support his construction business but as a result of the publicity surrounding the investigation his

business faded. He was forced to lay off all but one of his four employees.

Defendant also noted that he had already been punished for the conduct at issue. The OCC commenced a civil enforcement action against him, extracting a $75,000 penalty and $100,000 restitution obligation. Further, he was barred by order of the Board of Governors of the Federal Reserve from participating in any capacity in a federally-insured financial institution under the jurisdiction of the Federal Reserve or the OCC. Defendant noted that in *Koon* the Court approved a downward departure based on the fact that the defendant there had been subjected to successive state and federal prosecutions for the same conduct. 518 U.S. at 112, 116 S.Ct. 2035. He argued that his case presented an even stronger basis for departure because he was penalized in the first proceeding, while Koon was acquitted by the state court in the first of his two proceedings.

Based on these circumstances, defendant argued that, as in *Gaind,* his ability to engage in similar criminal conduct had been reduced or eliminated, and that due to the loss of business and reputation the sentencing purposes of individual and general deterrence were (partially) achieved. Defendant also stated that unless he was able to continue working there was no way he could meet the obligations imposed by the OCC, much less the substantial restitution obligation he faced in this case.[3] He claimed that if he was removed from the community for 18 months his business would perish.

I concluded that a departure from the applicable guideline range on this basis was warranted, although for reasons somewhat different than stated in *Gaind.* I found that the purposes of sentencing were at least partially achieved prior to the initiation of this prosecution; thus, it was proper to depart from the guideline range.

■ In imposing sentence, the court must always consider the purposes of sentencing. Congress set forth those purposes in 18 U.S.C. § 3553(a). Under that provision:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Congress has deferred to the Commission the role of deciding what constitutes a sufficient sentencing range in the typical case, consistent with these purposes. But that range contemplates only the typical case, one that falls within the so-called "heartland." *See United States Sentencing Commission Guidelines Manual* Ch. 1 Pt. A at 6 (1998). If the circumstances of the case reveal that the purposes of sen-

---

**3.** The parties agreed that defendant was liable for $2,480,000 in restitution, joint and several with Jeffrey Dahlman.

tencing have been fully or partially fulfilled *prior* to the imposition of sentence, a sentence within the range set forth by the guidelines may be "greater than necessary" to satisfy those purposes. 18 U.S.C. § 3553(a). Thus, the court, consistent with § 3553(a), should carefully consider exercising its departure authority under § 3553(b).

This basis for departure is not novel. Courts have long recognized that where the sentence called for by the guidelines would result in punishment greater than necessary the court can depart downward. For example, the Supreme Court in *Koon* approved a departure based on the defendant's enhanced susceptibility to abuse in prison. 518 U.S. at 112, 116 S.Ct. 2035. Similarly, courts have approved departures for alien defendants if the conditions of their confinement or other consequences of conviction would result in punishment more onerous than for the typical defendant convicted of the same offense. *See, e.g., United States v. Farouil,* 124 F.3d 838, 847 (7th Cir.1997); *United States v. Lipman,* 133 F.3d 726, 731 (9th Cir.1998); *United States v. Martinez–Alvarez,* 256 F.Supp.2d 917, 918–19 (E.D.Wis.2003); *United States v. Ferreria,* 239 F.Supp.2d 849, 852 (E.D.Wis.2002). Courts have also recognized that they may depart downward if the defendant's post-offense rehabilitative efforts reveal that he has turned his life around and is thus unlikely to re-offend. *See, e.g., United States v. Brock,* 108 F.3d 31, 35 (4th Cir.1997); *United States v. Jones,* 233 F.Supp.2d 1067, 1070–71 (E.D.Wis.2002).

What these departures have in common is that at least some of the purposes of sentencing are satisfied by circumstance(s) aside from the prison sentence called for

by the guidelines. For a defendant who faces more onerous conditions of confinement than the typical defendant, the court can impose a shorter prison sentence and obtain the same punitive effect. A departure is warranted because at least one of the purposes of sentencing—just punishment—is satisfied by a shorter sentence. Similarly, where a defendant has rehabilitated himself, the court can impose a reduced sentence and still protect the public, thus satisfying the sentencing purpose of specific deterrence.

 Therefore, where some unusual fact or circumstance causes one or more of the purposes of sentencing to be satisfied, a court may depart based on that fact or circumstance. In *Koon,* the Court said that a departure ground need not *necessarily* be consistent with the purposes of sentencing set forth in § 3553(a). 518 U.S. at 108, 116 S.Ct. 2035. However, to the extent that the Commission created a "heartland" consistent with and incorporating the statutory purposes of sentencing, the court is certainly free to consider whether the satisfaction of one or more such purposes as the result of unusual circumstances takes a case outside the heartland.[4]

In the present case, I found that, because of the unusual circumstances, several of the purposes of sentencing had already been satisfied. Thus, a departure was warranted under § 5K2.0.

Defendant was civilly prosecuted by the OCC before the filing of criminal charges, which resulted in a $75,000 penalty, a $100,000 restitution order, and debarrment from future involvement with federally regulated financial institutions. Defendant was also subjected to a great deal of ad-

---

4. Although this basis for departure is "unmentioned" in the guidelines, it is consistent with their structure and theory. It is also consistent with *Koon's* admonition that the

court consider § 3553(a) in setting "the overall sentence," whether within the guideline range or, if a departure is granted, outside such range. 518 U.S. at 108, 116 S.Ct. 2035.

verse publicity in his small town based on the FBI's investigation of his dealings with Dahlman and Evergreen Bank. This publicity soured his personal relationships with people he had known for a long time and caused emotional harm to his children. It injured his business, which was dependent on defendant's reputation and good will. Finally, the stress of the investigation contributed to the ill health of defendant's wife, and, he believes, to her death. In sum, defendant lost a lot based on his misconduct before he ever set foot in this court.

Some of this misfortune may have been appropriate; we expect that those who involve themselves in criminal activity will suffer some collateral consequences, and it is not always easy to decide "what adverse consequences should be considered unwarranted rather than the natural consequences of a criminal act." *United States v. Fotouhi*, No. 02–CR–38, 2002 U.S. Dist. LEXIS 14601, at *21 (E.D.Wis. July 11, 2002). But in this case, defendant clearly experienced more than the usual defendant, and three of the primary purposes of sentencing were partially achieved before this case was filed.

■ First, defendant was subjected to a substantial monetary penalty by the OCC and subjected to substantial amounts of adverse publicity, which caused direct and collateral harm to him and his family. These circumstances partially satisfied the need for just punishment. District judges may consider such successive punishments and the negative effects of adverse publicity in deciding whether to depart downward. *Koon*, 518 U.S. at 112, 116 S.Ct. 2035.

Second, the personal, business and family consequences defendant experienced will likely deter him from future misconduct, which mitigates the need to protect the public from further crimes he might commit. This finding was bolstered by the fact that defendant had no criminal record prior to these convictions and committed no further violations of the law since these offenses concluded.

Finally, someone else in defendant's position tempted to also become involved in such a scheme need only consider what happened to defendant in order to reconsider; thus, general deterrence was served as well.

■ Therefore, because these purposes of sentencing were at least partially fulfilled, I concluded that defendant's case fell outside the heartland. This departure was not based on the fact that defendant's business suffered; that may be a predictable consequence of his crimes, at least to the extent that his business was involved in the fraud.[6] *See Stefonek*, 179 F.3d at 1038. Nor was I departing based on his socio-economic class, *see* U.S.S.G. § 5H1.10, providing a break because he had more to lose than a poor defendant or one without a business. Defendant suffered punishment, loss and hardship beyond that usually seen or which can usually be expected in similar cases. The combination of factors mentioned above resulted in satisfaction of several of the purposes of sentencing, allowing mitigation of his punishment under the guidelines.

### C. Amount of Loss Substantially Overstated Seriousness of Offense

As a second and independent basis for departure, I concluded that the amount of loss attributed to defendant under the

---

**6.** In this respect, my conclusion diverges from that reached in *Gaind*. The destruction of a business used to commit fraud alone would not ordinarily take a case outside the heartland. Rather, it would be a predictable consequence.

guidelines substantially exceeded any fair measure of his culpability. Under application notes 8(b) and 11, the court may depart when the amount of loss determined under § 2F1.1(b)(1) significantly overstates the seriousness of the defendant's offense. U.S.S.G. § 2F1.1 cmt. n. 8(b) & 11 (1998).

Defendant was tagged with a loss amount of $2.48 million. As is relevant to the loss determination, defendant did two things. First, he submitted false and inflated invoices for construction work performed on the bank; Dahlman then issued money orders in the amount of the invoice; defendant kept some of the money, but Dahlman appropriated most of it. Defendant (or Dahlman impersonating defendant) [7] submitted invoices in the amount of $1,851,350, and Dahlman issued money orders in the total amount of $1,852,150 on those invoices. Defendant received $562,577.44 of that amount. Second, defendant endorsed money orders Dahlman issued without an invoice. These money orders totaled $980,000, of which defendant received $243,870.04; Dahlman got the rest. Defendant thus received a total of $806,447.48.

However, defendant performed a substantial amount of work on the bank; the PSR stated that the value of that work was estimated at about $300,000, although the market value could be higher—perhaps as much as $600,000 or $700,000. The appraised value of the bank property increased from $78,000 to $440,000 following defendant's efforts, a difference of $362,000. The PSR calculated the loss amount by subtracting $300,000—the estimated value of defendant's services—from the $1.8 million in fraudulent invoices submitted, then adding that figure to the $980,000 in fraudulent money orders defendant endorsed, for a total of $2.48 million.

The parties agreed that this loss figure was reasonable, and I had no reason to question it. However, even under the government's figures it appeared that, at most, defendant improperly received $500,000; at least, $100,000. The rest he earned based on the substantial amount of work he performed. Further, the PSR's calculations did not take into account the manner in which Dahlman had defendant perform work on the bank. Dahlman constantly changed his instructions as to how he wanted things done, even after the work was completed. For example, he would decide he wanted a wall moved six inches in one direction or another after it had been erected, requiring defendant to tear it down and start over. This happened numerous times. None of this work contributed to the market value of the property, but it did cost defendant labor and materials. Defendant also performed a substantial amount of work on Dahlman's property in Berlin, Wisconsin, valued at about $140,000, which Dahlman convinced him to do as a friend. He also did work on Dahlman's home in Green Lake. Wisconsin. Therefore, it may well be that defendant realized *no* improper gain based on his involvement in Dahlman's scheme, yet his guideline range was increased based on a loss amount of almost two and one-half million dollars. Finally, the loss figure did not account for the fact that Dahlman forged about $400,000 of the $1.8 million in invoices submitted, cutting defendant out of this aspect of the scheme entirely.

■ In cases in which the loss determination results in an offense level that substantially overstates the severity of the offense, the court may depart. This is, in

---

**7.** It appears that Dahlman simply forged $400,000 of the $1,800,000 in invoices submitted for defendant's work.

*Koon's* nomenclature, "an encouraged basis for departure." *United States v. Corry*, 206 F.3d 748, 751 (7th Cir.2000). Even under the current version of the guidelines, the court may depart on this basis. *See* U.S.S.G. § 2B1.1 application note 18(C) (2003).

The are four basic situations in which such a departure may be appropriate. *United States v. Forchette*, 220 F.Supp.2d 914, 924–25 (E.D.Wis.2002).

■ The first is the "multiple causation" scenario, in which the amount of loss is the product of several sources (e.g., an economic downturn, a market collapse, or negligence by the victims), in addition to the defendant's conduct. *Id.* at 924 (citing *United States v. Rostoff*, 53 F.3d 398, 406–08 (1st Cir.1995)).

■ The second departure situation occurs when there is a gross disparity between the actual loss and the defendant's intended loss. *See, e.g., United States v. Stockheimer*, 157 F.3d 1082, 1089–92 (7th Cir.1998); *United States v. Roen*, 279 F.Supp.2d 986, 991 (E.D.Wis.2003). Under § 2F1.1 (and now § 2B1.1), courts determine loss based on the higher of the actual or the intended loss. *Stockheimer*, 157 F.3d at 1089. But in some cases, as where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended loss because it bears no relation to "economic reality." *Forchette*, 220 F.Supp.2d at 924–25.

■ The third situation occurs when the defendant's effort to remedy the wrong merits consideration, as, for example, where he makes extraordinary restitution or, in a fraudulent loan case, where he had sufficient unpledged assets to cover the loss. *Id.* at 925 (citing *United States v. Oligmueller*, 198 F.3d 669, 671–72 (8th Cir. 1999)).

■ Finally, the unusual nature of the fraudulent conduct or of the defendant's role in it may provide a basis for a departure. For example, the defendant may have had a limited or inferior role in the fraud that bore little relationship to the amount of the loss; he may have had little or no knowledge of the total amount being taken, such that it would be unfair to attribute the entire amount of loss to him; or the defendant's fraud may have been for little or no gain, especially in comparison to the size of the loss. *Id.* at 925 (collecting cases).

■ The present case fell into the last category. Defendant's conduct and his role in this scheme simply were not consistent with that usually seen in a two and a half million dollar fraud case. First, Dahlman came up with the scheme, and defendant was recruited to participate in just one aspect of it.[8] *See United States v. Costello*, 16 F.Supp.2d 36, 38 (D.Mass. 1998) (granting downward departure where defendants "did not come up with the scheme at the outset"). His involvement was a by–product of legitimate construction work he was performing on the bank. *See United States v. Nachamie*, 121 F.Supp.2d 285, 295–97 (S.D.N.Y.2000), *aff'd*, 5 Fed.Appx. 95 (2d Cir.2001) (departing where defendants initially became involved with mastermind of scheme with honest intentions but later became involved in illegality).

Second, Dahlman controlled the amount of loss caused by the scheme; he dictated

---

8. Dahlman stole money from the bank in several different ways, including by directly embezzling funds from general ledger accounts, diverting income from the bank, paying salaries to ghost employees, and making phony loans, aside from tampering with the bank premises account—the portion of the scheme with which defendant was involved. As noted, Dahlman caused a total loss of almost $4,000,000.

the amount to be paid on the fraudulent invoices—whatever amount was needed to cover his looting of the bank. *See Forchette*, 220 F.Supp.2d at 925 (departing where the head of the scheme rather than the defendant decided on the amount of and produced the fraudulent checks, thereby controlling the amount of loss produced).

Third, defendant's gain was minuscule compared to the total amount taken. In *United States v. Stuart*, 22 F.3d 76 (3d Cir.1994), the defendant, for a payment of $2000, agreed to transport stolen government bonds, which had a value of $129,000. The court found that the loss amount was properly computed as $129,000, but stated:

> Nevertheless, we are left with the definite impression that, notwithstanding the proper application of the Guidelines, a nine-level enhancement under these circumstances may well overstate both the degree of Stuart's criminality and his need to be corrected. At most, Stuart agreed to deliver stolen bonds on two occasions, for a total payment of $2,000. If on remand Stuart requests a downward departure, the district court may well find there to be little relationship between Stuart's role in the offense and the value of the stolen property he was carrying.

*Id.* at 82; *see also Forchette*, 220 F.Supp.2d at 926 (departing where defendant's gain was minimal compared to loss amount); *Costello*, 16 F.Supp.2d at 39 (granting downward departure based on the extent of the disproportion between the loss to the victim and the gain to the defendant). Here, defendant may have improperly gained nothing from his crime; at most he received $500,000, yet the loss amount attributed to him was five times that.

Thus, for all of these reasons, I concluded that the amount of loss attributed to defendant substantially overstated the seriousness of his offense.

## D. Degree of Departure

On either or both of the grounds stated, a departure was warranted. I did not rely on these grounds cumulatively; rather, each independently sustained a departure.

 Once a court decides to depart the extent of the departure is a matter within the court's discretion. *See United States v. Cruz–Guevara*, 209 F.3d 644, 647 (7th Cir.2000). "The law merely requires that district judges link the degree of departure to the structure of the Guidelines and justify the extent of the departure taken." *United States v. Scott*, 145 F.3d 878, 886 (7th Cir.1998). While there are no hard and fast rules to governing this determination, the Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *Cruz–Guevara*, 209 F.3d at 648.

 In the present case, I concluded that a departure of two levels was appropriate. The most appropriate analogy to an existing guideline was to U.S.S.G. § 3B1.2(b). *See Forchette*, 220 F.Supp.2d at 930–31 (granting 2 level departure by analogy to § 3B1.2 where amount of loss substantially overstated seriousness of offense and defendant's role in creating loss was, in effect, "minor"). The district court is authorized to depart by analogy to § 3B1.2 where the defendant's role in the scheme reveals that the loss amount attributed to him substantially overstates the seriousness of his criminal conduct.[9]

---

**9.** In the recent amendments to the guidelines enacted pursuant to the PROTECT Act, the Commission forbid departures based on role in the offense, which may now be taken into account only under § 3B1.2. U.S.S.G. § 5K2.0(d)(3) (Oct. 27, 2003). However, even if those amendments applied here, my deci-

*See United States v. Restrepo,* 936 F.2d 661, 667 (2d Cir.1991); *Nachamie,* 121 F.Supp.2d at 297 n. 11. In *Restrepo,* the court departed by analogy to § 3B1.2 in a money laundering case, even though it had granted a reduction directly under that provision. The court stated:

> We conclude that where, as here, an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense, a downward departure may be warranted on the ground that minimal participation exists to a degree not contemplated by the guidelines. . . .
>
> . . .
>
> The Commission apparently contemplated some connection between the quantity of money implicated and the extent of a defendant's participation in the offense. [W]hen an aggravating factor is translated to a sliding scale of offense levels, the assumptions underlying that translation cannot fairly reflect every possible case. *Cf.* U.S.S.G. § 2F1.1, comment. (n. 10) (increasing the offense level for crimes of fraud based upon monetary loss may require downward departure if the seriousness of the offense is thus overstated).

*Id.* at 667.

The amount of loss attributed to defendant here also had a dramatic effect on his sentence, although his gain was minimal in comparison. However, this does not mean that defendant's gain is a suitable proxy for the loss amount. *See Forchette,* 220 F.Supp.2d at 931; *see also Corry,* 206 F.3d at 751. There may be rare cases where that is largely true, *cf. Roen,* 279 F.Supp.2d at 992 (departing 9 levels where intended loss grossly exceeded actual loss), but this is not one of them. Defendant's

conduct led directly to an actual loss of 2.48 million dollars. The fact that he did not receive the lion's share did not diminish the harm he caused to the victim bank. Thus, I concluded that a two level departure appropriately discounted the sentence under these circumstances, without depreciating its seriousness, as in *Forchette.*

I also concluded that a "concurrent" two level departure was appropriate based on the satisfaction of some of the purposes of sentencing. This extent of departure left defendant in Zone D, with an imprisonment range of 12–18 months. I concluded that notwithstanding the circumstances warranting departure reducing the sentence to Zone B or C would unduly depreciate the seriousness of the offense. This was a scheme of vast proportions which seriously harmed the victim bank, and while defendant may not have fully understood its scope, he engaged in repeated acts over four years that enabled Dahlman to loot the bank. It was frankly difficult to understand how someone like defendant Redemann, a respected contractor and family man with no record, could have involved himself in this activity for so long. A prison sentence was required to *fully* satisfy the purposes of sentencing.

### III. CONCLUSION

With a two level departure, the revised offense level was 13 and the imprisonment range 12–18 months. I sentenced defendant to 12 months and one day in prison. Other conditions of sentence appear in the judgment.

---

sion would not be affected. I did not depart based on role in the offense; rather, I departed based on loss overstating the seriousness of the offense, which remains a viable departure basis. *See* U.S.S.G. § 2B1.1 application note 18(C) (2003). Section 3B1.2 was referenced only by analogy to tie the degree of departure to the structure of the guidelines.