UNITED STATES of America,
Plaintiff,

v.

Anthony SMITH, Defendant.

No. 03–CR–92.

United States District Court,
E.D. Wisconsin.

March 30, 2004.

---

Nelson W. Phillips, III, Milwaukee, WI, for Plaintiff.

Peter J. Kovac, Milwaukee, WI, for Defendant.

### MEMORANDUM

ADELMAN, District Judge.

Defendant Anthony Smith sold some crack to a confidential government informant on February 16, 2000. Several weeks later, the informant tried to contact defendant to set up another transaction. Defendant did not return his calls. The government then lost track of defendant until May 2003, when it indicted him on one count of distribution of cocaine base.

Defendant pled guilty to the charge, and a pre-sentence report (PSR) was prepared in anticipation of sentencing. Because the transaction involved 59 grams of crack co-

caine, defendant's base offense level was 32. U.S.S.G. § 2D1.1(c)(4). Following a three level reduction for acceptance of responsibility, defendant's adjusted offense level was 29. Coupled with a criminal history category of IV, his imprisonment range was 121–151 months.

There was little out of the ordinary about the transaction that got defendant indicted, and those who sell crack cocaine to government agents usually face stiff sentences under the guidelines. However, the present case was unusual in that in the three years between the offense and the indictment, defendant underwent a wholesale transformation: on his own initiative, he gave up dealing, found a steady job, got married, bought a home, had a baby, and obtained custody of his 13 year old son from a previous relationship. When the cleaning company for whom he had become the star employee left town, he started his own cleaning business. At the time he was indicted, defendant was simply not the same person as when he sold crack to the informant three years previously.

Prior to sentencing, defendant moved for a downward departure under U.S.S.G. § 5K2.0, arguing that his voluntary withdrawal from the criminal lifestyle and substantial post-offense rehabilitative efforts during the three years between the offense and the indictment took his case outside the heartland. Skeptical about defendant's assertions, I adjourned sentencing so that defendant could provide proof to back up his claim that he had changed.

Defendant produced evidence supporting his claim. Satisfied that he was telling the truth, I granted his motion and departed downward. In this memorandum, I set forth the basis for my decision.

## I. DEPARTURE STANDARD

The court may depart from the guidelines if it finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. 18 U.S.C. § 3553(b). The Sentencing Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "discouraged" bases for departure, and "encouraged" bases for departure. *Koon v. United States*, 518 U.S. 81, 93–95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

The Supreme Court in *Koon* adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden, encouraged, or discouraged departures based on those factors?

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (internal citations omitted).

## II. DEFENDANT'S MOTION

Defendant argued that his case fell outside the heartland for two related reasons. First, he stated that he voluntarily with-

drew from the drug trade shortly after the February 16, 2000 transaction, reformed himself, and led a productive, law abiding life. He presented character references and affidavits supporting these assertions. Second, defendant stated that due to the more than three year delay between the transaction and his indictment in May 2003, and his withdrawal from a criminal lifestyle, he was unable to cooperate with the government and (potentially) obtain a downward departure motion under § 5K1.1.

### A. Voluntary Withdrawal from Criminal Activity/Post–Offense Rehabilitation

#### 1. Appropriate Departure Standard

■ Defendant's first suggested ground for departure is referenced in U.S.S.G. § 3E1.1, which provides for an offense level reduction for acceptance of responsibility. In deciding whether to grant the reduction, a court may consider the defendant's "voluntary termination or withdrawal from criminal conduct or associations" and his "post-offense rehabilitative efforts." U.S.S.G. § 3E1.1 cmt. n. 1(b) & (g). Thus, the guidelines arguably may take this suggested ground for departure into account; if so, a departure is permitted only if the factor is present to an exceptional degree.

■ Under the circumstances of the present case, however, it seemed somewhat formalistic to say that this ground of departure was taken into account by § 3E1.1. Although defendant received a reduction for acceptance of responsibility, the reduction was based on the fact that he acknowledged his involvement in the offense and promptly pled guilty. In most cases, the entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct, is sufficient to obtain the reduction for acceptance of responsibility, without regard to the other factors listed in note 1(b). *See* U.S.S.G. § 3E1.1 cmt. n. 3. Thus, it was questionable whether defendant's withdrawal from criminal conduct and his post-offense rehabilitative efforts had really been taken into account in formulating his guideline range.[1]

However, most courts, including this one, have considered this departure factor as one taken into account under § 3E1.1. *See United States v. Jones,* 233 F.Supp.2d 1067, 1070–71 (E.D.Wis.2002) (collecting cases). Thus, I concluded that a departure could be granted only if the factor was present to an unusual degree.

The Seventh Circuit has allowed departures for exceptional remorse or acceptance of responsibility. *See, e.g., United States v. Gee,* 226 F.3d 885, 900–02 (7th Cir.2000); *United States v. Carter,* 122 F.3d 469, 475–76 (7th Cir.1997). Similarly, every circuit to consider the issue after *Koon* has allowed departures based on extraordinary post-offense rehabilitation. *See Jones,* 233 F.Supp.2d at 1070 (collecting cases). In order to obtain such a departure, the defendant must show that his efforts were exceptional enough to be atypical of the cases in which the acceptance of responsibility reduction is usually granted. *See, e.g., United States v. DeShon,* 183 F.3d 888, 889 (8th Cir.1999).

#### 2. Effect of the October 2003 Guideline Amendments

I recognized that the guideline amendments enacted on October 27,

---

1. It is also worth noting that a § 3E1.1 reduction should not be granted based solely on post-offense rehabilitation. *See United States v. Speck,* 992 F.2d 860, 862–63 (8th Cir.1993). Generally, there must be more, i.e. a plea of guilty and admission of wrongdoing.

2003 pursuant to the PROTECT Act forbid departures based on acceptance of responsibility, which now may be considered only under § 3E1.1. *See* U.S.S.G. § 5K2.0(d)(2) (2003). However, I concluded that this prohibition did not cover departures based on post-offense rehabilitation, such as that sought here. The Commission did not explain the breadth of the new guideline, i.e. whether it extends to all departures based on the factors listed in application note 1 of § 3E1.1. In providing the reasons for the amendment, the Commission merely re-stated the prohibitions contained in the new guideline. *See United States Sentencing Commission Guidelines Manual, Appendix C* 362 (2003) (Amendment 651). However, it is significant that the Commission did not broaden § 5K2.19, which bars departures based on post-*sentencing* rehabilitative efforts, to include departures based on post-*offense* rehabilitative efforts. In the commentary that accompanied the amendment that created § 5K2.19 in 2000, the Commission specifically noted that departures based on post-offense rehabilitation were unaffected by § 5K2.19. *See United States Sentencing Commission Guidelines Manual, Appendix C* 75 (2002) (Amendment 602).

Given the lack of guidance from the Commission, and the lack of any amendment to § 5K2.19, I concluded that the Commission did not intend to ban departures based on all of the factors listed in application note 1 to § 3E1.1. The new guideline is best read in one of two ways, both of which support my conclusion.

First, the Commission may have intended to bar courts from departing so as to, in effect, provide a reduction for acceptance of responsibility when the defendant did not qualify for the reduction directly. This was the sort of departure at issue in *Gee.* In that case, the defendant was not eligible for a reduction under U.S.S.G. § 3E1.1 because he had gone to trial. However, the district court granted him a two level downward departure for acceptance of responsibility under § 5K2.0 based on a finding that he demonstrated "non-heartland" acceptance of responsibility by making early and consistent offers to the government to determine the legality of his business through a civil declaratory judgment action and immediately discontinuing his business following the verdict against him. The court of appeals affirmed, finding that while in the ordinary case such post-trial conduct would be unremarkable, in the unusual circumstances of this case, it demonstrated a different form of acceptance of responsibility worthy of a departure. 226 F.3d at 900–02. In promulgating § 5K2.0(d)(2), the Commission may have intended to block this type of departure.[2]

Second, the Commission may have intended § 5K2.0(d)(2) to prohibit departures based on acceptance of responsibility as that term if commonly understood— pleading guilty and truthfully admitting the conduct comprising the offense of conviction. To the extent that the defendant has done those things, the two or three level reduction provided under § 3E1.1 is all that he is entitled to. But when the

---

**2.** The Commission may similarly have meant in § 5K2.0(d)(3) to block courts from departing to grant a reduction for "mitigating role" when the defendant did not qualify for that reduction directly under § 3B1.2. *Cf. United States v. Bierley,* 922 F.2d 1061, 1069 (3d Cir.1990) ("[W]hen an adjustment for Role in the Offense is not available by strict application of the Guideline language, the court has power to use analogic reasoning to depart from the Guidelines when the basis for departure is conduct similar to that encompassed in the Role in the Offense Guideline.").

defendant has done much more, the court may depart based on factors listed in application note 1. This interpretation is consistent with the so-called "rule of lenity"—that canon of statutory construction which holds that ambiguous penal statutes are to be construed narrowly and in the defendant's favor. *See United States v. Granderson*, 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994).

Finally, I note that in *United States v. Chapman*, 356 F.3d 843, 848 n. 1 (8th Cir.2004), the court recognized the ban on departures for acceptance of responsibility contained in § 5K2.0(d), but suggested that departures for post-offense rehabilitation were still available under § 5K2.0(a)(2)(B). For all of these reasons, the first ground of departure urged by defendant was not foreclosed by the October 2003 amendments.

### 3. Ex Post Facto Analysis

■ Ultimately, however, I did not have to determine whether § 5K2.0(d)(2) applied to departures for post-offense rehabilitation because, even if it did, application in the present case would violate the Ex Post Facto Clause. The instant offense occurred in February 2000, long before § 5K2.0(d)(2) was enacted.

In *United States v. Mallon*, 345 F.3d 943, 946–47 (7th Cir.2003), the court held that the new appellate standard of review adopted in the PROTECT Act applies to appeals considered after the Act's effective date, and that the Ex Post Facto Clause is not offended by the application of that new standard in cases in which the crime was committed prior to the Act's effective date. This was so, the court held, because the Act did not change the punishment for the offense, it merely changed the allocation of

authority between the district and circuit courts. *Id.* at 946. However, the application of guideline amendments adopted after commission of the offense that forbid or restrict grounds for departure is a different matter. In *United States v. Seacott*, 15 F.3d 1380, 1386 (7th Cir.1994), the court held that "a guideline amendment which occurs after the commission of the defendant's crime which works to the defendant's detriment is inapplicable because it is a violation of the ex post facto clause." An amendment prohibiting an otherwise available departure certainly works to the defendant's detriment. There is no meaningful distinction between guideline provisions that increase a defendant's imprisonment range and those which block a judge from departing to reduce that range. Thus, to have applied § 5K2.0(d)(2) in the present case would have violated the Constitution. *See United States v. Lester*, 268 F.Supp.2d 514, 515 n. 2 (E.D.Pa.2003) (concluding, with the government's agreement, that the PROTECT Act did not apply to downward departure motion before district court); *see also United States v. Redemann*, 295 F.Supp.2d 887, 892 (E.D.Wis.2003).

For all of these reasons, I concluded that I had the discretion to depart on the first basis defendant suggested.

### 4. Application of Standard to Defendant's Motion

■ I also concluded that based on the unusual facts of the present case a departure was warranted. Defendant's efforts at self-improvement and his complete withdrawal from a criminal lifestyle removed his case from the heartland of typical drug distribution cases where the defendant received a § 3E1.1 reduction.[3]

---

**3.** As Judge Gertner has noted: "The heartland analysis focuses attention on the crime—how the defendant's acts compare to others convicted of the same crime." *United States* *v. Silveira*, 297 F.Supp.2d 349, 357 (D.Mass. 2003). It would make little sense in this case to compare defendant's actions with those of,

For defendant to come from the position he was in at the time he committed the crime, to the position he was in at the time of his indictment was extraordinary. Through affidavits and other reliable evidence, the court was able to determine the path defendant had taken.

On February 16, 2000, defendant engaged in the controlled drug buy that formed the basis for the indictment. The following month, he made the decision to stop dealing drugs. He did not do so because he knew he was under investigation, but rather because it was the right thing to do. The evidence showed that this was a decision of conscience not convenience. Later that year, defendant secured a job with APL Cleaning, which he held into 2003. He got married on September 18, 2001, and in June 2002 had a baby girl, Alexia. Defendant and his wife purchased a home. Defendant also secured custody of his 13 year old son from a prior relationship, Tracy.

In this court's experience, few individuals with this defendant's background and criminal history[4] make such a radical transformation, not only giving up crime, but getting married, assuming responsibility for children, securing employment, and purchasing a home. These actions reflected a degree of maturity and stability that should not go unnoticed and unrewarded. In fact, the government, which opposed the motion, acknowledged that if the defendant actually made the changed outlined above, it would be unusual.

But the government was skeptical about this transformation—I was too, which is one of the reasons why I adjourned the

matter so that defendant could provide additional information regarding what he was doing for those three years.[5] As the government noted, just because defendant was not arrested during this time does not mean that he underwent a major change. However, the undisputed evidence supported defendant's claim.

First, as the government acknowledged, the confidential informant attempted to arrange a second controlled buy from defendant a few weeks after the initial transaction but never received a call back. This corroborated defendant's claim that he gave up dealing in March 2000. There was no evidence that defendant knew the informant was working with police and declined to re-involve himself for that reason.

Second, defendant's claim was supported by affidavits from his employer and his wife, as well as letters from other supporters. Moreover, his professed motivation for making this change rang true. Defendant indicated in his affidavit that two events occurred that motivated him to change. First, a friend of his was killed in a drug transaction. That incident brought home to him the danger in which he placed himself and others by dealing drugs. Second, defendant's then-girlfriend, with whom he was considering marriage, made him promise that if she agreed to marry him he would give up dealing. The evidence showed that he kept that promise.

Diana Smith indicated that she met defendant in 1997 when he was working at a retail fish store operated by Annette Roby. They began dating the following year. Di-

---

say, a white collar criminal who comes from an entirely different background.

4. Defendant's prior record included convictions for second degree sexual assault of a child in 1994 (based on sexual contact with a 14 year old girl when he was 22), delivery of

cocaine in 1994, and failing to support two of his children in 1996.

5. For instance, the PSR was able to confirm only sporadic employment during this time. I advised defense counsel to provide proof that defendant was working full-time.

ana knew at the time that defendant was involved in drug activity. When the two began discussing marriage in 2000, she told him that he would have to disassociate himself from illegal drugs if he was serious about getting married and starting a family. Defendant told her about the friend who had been killed, and that he knew drug dealing was dangerous. He promised her that he would stop. Diana agreed to marry defendant but waited for over a year to make sure he kept his promise. They married in September 2001. The following year, they had a baby girl, Alexia. Defendant also obtained custody of Tracy. It was significant that one of defendant's prior convictions was for failing to support Tracy. Assuming full custody of his son went one step further than merely supporting him financially.

Diana indicated that defendant worked as a car porter for a time, then began working for the cleaning company, where he often worked long hours. After the company moved out of town, defendant started his own cleaning business, which he was operating at the time of his arrest. Defendant and Diana are buying a home on a land contract from defendant's uncle.

The owner of APL Cleaning, Paula Yarn, confirmed in an affidavit that defendant was employed there from late 2000 through early 2003. She was not certain of the exact dates because defendant did much of his work "off the books." This explained why the PSR was able to confirm only minimal earnings from this employer. One of the reasons I adjourned the previous sentencing was to obtain better information on defendant's employment. I accepted Yarn's statement that defendant worked for her steadily from 2000 to 2003. It was of some concern that this was work done off the books. Yarn indicated that she is currently negotiating with the government to make payments on back taxes. However, because she was

forthright about that in her affidavit, I saw no reason to disbelieve her and credited her affidavit. *See* U.S.S.G. § 6A1.3. Further, this provided no reason to question defendant's commitment to a changed lifestyle.

Yarn stated that defendant was one of her most trusted employees. He worked as much as possible and was always available, even on short notice. She indicated that within six months defendant earned her trust. He showed leadership and responsibility, eventually becoming a supervisor. Yarn stated that defendant was a great asset to the company after September 11, when the company was called upon more frequently for church events. Defendant stepped in and worked double shifts when needed and did whatever was necessary to get the job done.

The court also received a letter from defendant's 13 year old son, Tracy. Tracy stated that his father was a good and honest man, who took him in when he was asked to and provided him with everything that he needed. Tracy stated that defendant was his idol and his role model. A letter from a family friend, Nancy Leichman, who is an Assistant Director at Marquette University, stated that Tracy has a 3.00 GPA and thinks only of making his father proud.

The court also received a letter from Sylvia Dixon, the mother of defendant's daughters from a previous relationship, Aaliyah and Antynette. Ms. Dixon stated that defendant was always there for his daughters and that they spent the entire summer of 2002 with him. They also spent every weekend with him prior to his arrest. Sylvia's mother Dorothy also wrote, indicating that defendant was a loving father to her grandchildren. She stated that when her daughter was undergoing chemotherapy and knee replacement surgery defendant was always there for her.

Finally, the court received a letter from Roby indicating that defendant was a good employee when he worked for her.

I acknowledged this evidence not because defendant deserved a departure for being a nice guy. Rather, this evidence supported his claim of a "fundamental change in attitude." *United States v. Craven*, 239 F.3d 91, 99 (1st Cir.2001). As the First Circuit has noted: "Surely extraordinary rehabilitation means something more than merely behaving lawfully after years of criminal activity." *United States v. Craven*, 358 F.3d 11, 16 (1st Cir.2004). Defendant had shown something more through this evidence.

The present case is similar to *United States v. Cornielle*, 171 F.3d 748 (2d Cir. 1999), where the court granted a downward departure. In *Cornielle*, the defendant, upon being paroled from prison on a drug charge, secured employment and became a tremendous asset to his employers. He married, obtained a stable residence and had a child on the way. He had also returned to college, earning all "A's" and "B's," and had undertaken volunteer work. However, the government then indicted him a perjury charge based on testimony he gave at a civil trial four years earlier. *Id.* at 750–51.

The defendant pled guilty to the perjury charge, then sought a downward departure on various grounds, including the government's pre-indictment delay in prosecuting him and his rehabilitation while in state prison and thereafter. The defendant argued that he had been prejudiced by the four-year delay between the 1993 perjury and the filing of perjury charges against him in 1997, because in the meantime he had rehabilitated himself and reestablished his ties in the community. *Id.* at 750.

The district court concluded that this combination of factors warranted a limited departure. The court of appeals affirmed, noting that a defendant's "successful effort to rehabilitate himself by his own actions [may remove] the case from the heartland of the more typical cases." *Id.* at 754.

Similarly, in *United States v. Workman*, 80 F.3d 688, 701–02 (2d Cir.1996), the court affirmed a downward departure where the defendant, upon release from prison for another offense in the fall of 1990, left the gang with which he had been involved and joined the Army. The defendant rehabilitated himself and completed his military service honorably. The court noted: "This rehabilitation was not undertaken at the spur of impending prosecution for the crimes at issue in this appeal. It was an independent (and quite impressive) effort." *Id.* at 701.

It is important to note that like *Workman*, but unlike some other cases where departures were granted for extraordinary post-offense rehabilitation, defendant Smith's transformation occurred before he was arrested or even knew he was under investigation. *Cf. United States v. Lange*, 241 F.Supp.2d 907, 911 (E.D.Wis.2003) (collecting cases). This indicated that his transformation was motivated by the desire to improve himself and care for his family, not to impress a judge or prosecutor.

For all of these reasons, I concluded that this case fell outside the heartland.

**B. Delay in Indictment/Lost Opportunity to Cooperate**

█ Defendant also sought a departure based on the lost opportunity to cooperate. The government noted that the court may not depart based on a defendant's efforts at cooperation absent a motion from the government. This was correct, but not exactly what defendant argued. He moved for a departure not because he assisted the government, but because the delay in indicting him coupled with his decision to leave the drug business result-

ed in the loss of an opportunity to cooperate, which would have existed had he been indicted immediately. Because it is not forbidden by the Commission, this is a circumstance that may form the basis for a departure. *See, e.g., United States v. Saldana,* 109 F.3d 100, 104 (1st Cir.1997) (holding that delay could produce sentencing consequences so unusual and unfair that a departure would be permissible).

However, the delay in indicting defendant was not extreme or unusual. *See, e.g., United States v. Brye,* 146 F.3d 1207, 1214 (10th Cir.1998); *United States v. Labeille–Soto,* 163 F.3d 93, 101 (2d Cir. 1998). While perhaps he could have obtained a substantial assistance departure had he been indicted more swiftly, this was conjecture. He demonstrated no prejudice based on the delay. *See Cornielle,* 171 F.3d at 753.

Thus, I concluded that the delay did not take the case outside the heartland, and therefore I declined to exercise my discretion to depart on this basis. *See Brye,* 146 F.3d at 1214 (finding that three year delay was neither extreme nor implicitly sinister, but rather the type of delay that is ordinary in the fabric of criminal proceedings).

### C. Extent of Departure

■ Once a court decides to depart, the extent of the departure is a matter within the court's discretion. The departure must be reasonable and tied to the structure of the guidelines. While there are no hard and fast rules governing this undertaking, the Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *See United States v. Cruz–Guevara,* 209 F.3d 644, 647–48 (7th Cir.2000).

In the present case, I granted defendant a two level departure, which equaled the reduction allowed by § 3E1.1(a) and provided sufficient reward without unduly depreciating the seriousness of the offense. *See Lange,* 241 F.Supp.2d at 914; *Jones,* 233 F.Supp.2d at 1073–74.

### III. CONCLUSION

When a defendant whose prior record and offense conduct provide little hope for reform disengages himself from unlawful conduct and becomes the law-abiding citizen society needs, the courts should take notice. Anthony Smith made such a transformation because it was the right thing to do, for himself and his family. He earned a downward departure.[6]

---

**6.** Arguably, departing on the basis suggested here could create disparity between defendants charged immediately after offending, and those, like defendant, who are indicted years later and thus afforded a greater opportunity to reform. For two reasons, that concern did not warrant denial of the motion here. First, the government delayed indicting defendant for three years without any specific reason. I do not suggest that the government did anything improper in indicting defendant three years later, but by doing so it took the risk that circumstances would change. Second, as defendant argued, the delay may have also hurt him; because he had lost his contacts in the drug world, there was no meaningful opportunity for him to cooperate. Therefore, although I did not depart based on the delay, it was worth consideration in this context.