In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1684, 99-3642 & 99-3767

United States of America,

Plaintiff-Appellee, Cross-Appellant,

v.

Stanley Wright,

Defendant-Appellant

and

Deniese Watts,

Defendant-Appellant, Cross-Appellee.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 CR 290--Ann Claire Williams, Judge.


Argued June 5, 2000--Decided July 7, 2000


   Before Easterbrook, Diane P. Wood, and Evans, Circuit
Judges.

   Easterbrook, Circuit Judge.  Of sixteen defendants
indicted for smuggling and distributing heroin,
twelve pleaded guilty and four were tried and
convicted. Two of these four (Stanley Wright and
Deniese Watts) have appealed, and the United
States has taken a cross-appeal concerning
Watts's sentence. Defendants' arguments do not
require extended discussion. For example, Wright
contends that the evidence against him is
insufficient because the prosecution's witnesses
were liars. But such an argument is pointless on
appeal, for the jury determines credibility. The
testimony at issue, though from the mouths of
confessed law-breakers, did not conflict with
other evidence too reliable to disregard, so the
jury could accept it. Watts's principal claim,
that the prosecutor violated the requirements of
Brady v. Maryland, 373 U.S. 83 (1963), by
withholding favorable evidence, founders on the
fact that the prosecutor orally alerted defense
counsel before trial to the exculpatory evidence.
That defense counsel did not follow up by

obtaining more details can't be treated as a constitutional violation by the prosecutor. (Counsel's shortcomings might be grounds for relief if the totality of the representation fell below the constitutional floor, see Strickland v. Washington, 466 U.S. 668 (1984), but Watts's appellate lawyer sensibly reserved that issue for potential proceedings under 28 U.S.C. sec.2255.)

Only one of defendants' contentions requires additional comment. Marquis Jones testified that Deniese Watts's ex-husband Troy introduced Stanley Wright as his "enforcer, and he told me-- not in front of Stan, but he had told me that, you know, he had a couple of murders . . . and like that on his record." The district judge immediately told the jury to disregard this prejudicial statement. At a side bar conversation, the district judge learned that in 1973 Wright had been convicted of murder, but that this conviction had been reversed, after which Wright pleaded guilty to manslaughter. The judge also learned that before trial Jones had been instructed not to refer to this conviction. The judge then stated in open court:

We're ready to proceed, ladies and gentlemen, and I told you you should disregard the last remark, and in addition I wanted to advise you that Stanley Wright has not been convicted for any murder, so you should totally disregard it. Wright contends that he is entitled to a new trial because the jurors were bound to ignore this instruction.

Whatever weaknesses limiting instructions may have, Wright's problem is that this was not a "limiting" instruction at all. The judge did not tell the jurors to consider the murder for one purpose but forget about it for other purposes, nor did she tell them to put Wright's criminal record out of mind. Instead the judge told the jury that Jones's testimony was false--that Wright did not have "a couple of murders . . . and like that on his record." Jurors told that a witness's statement is untrue need not engage in mental struggle to disregard a fact that they deem important but the law asks them to ignore. The judge's actual instruction would be problematic only if some jurors were tempted to believe one criminal's statement to another over the word of a federal judge. But why would a juror do that? Perhaps a juror could think that the witness and the judge were using terms differently--that the judge was discussing convictions, while Troy Watts (and thus Marquis Jones) meant by "record" Wright's actual deeds. But Wright does not make such an argument and did not ask the judge to clarify matters further. All things considered, the episode did more to help

Wright than to harm him, because it could have planted seeds of doubt in jurors' minds. If Jones testified falsely about Wright's criminal record, jurors might ask themselves, how many other tall tales did Jones tell? Listeners often judge the veracity of their interlocutors by what is verifiable. If Jones lied about something that could be verified (Wright's criminal record), maybe he was inventing the rest of his story too. What matters on appeal, however, is that a "falsity instruction" is more powerful than a limiting instruction, see United States v. Smith, 995 F.2d 662, 676 (7th Cir. 1993), and sufficed to prevent the jury from thinking Wright a murderer.

Watts's offense level under the Sentencing Guidelines was 38, which with her clean criminal record produced a presumptive range of 235 to 293 months' imprisonment. But the district court sentenced Watts to only 170 months, departing downward on account of what the judge called "extraordinary family circumstances." The judge recognized that "[f]amily ties and responsibilities . . . are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. sec.5H1.6; see also 28 U.S.C. sec.994(e). But "ordinarily" is not "never," see Koon v. United States, 518 U.S. 81, 95-96 (1996), and the judge believed that Watts's circumstances were extraordinary. A clinical psychologist submitted a report that Joshua Watts, the seven-year-old son of Deniese and Troy who had a strong bond with his mother, became "anxious and depressed as a result of learning that his mother may possibly not continue to live with him" and that this anxiety had led to a conflict with a school classmate and a decrease in academic performance. After reciting the psychologist's main findings, the district judge concluded that a downward departure is appropriate.

Although appellate review is deferential, we think it impossible to say that the clinical psychologist's report details anything "extraordinary" about Deniese Watts's family ties and responsibilities. Normal children react adversely to learning that their parents will be absent for years on end. Troy has been incarcerated for some time, and the district judge found that he "has played little or no role in Joshua's life for the last several years." The prospect of losing his remaining parent is bound to disturb a child. But this is true of any normal child. "Imprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children." United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999). If the

mundane findings with respect to Joshua justified a departure, then the norm in sec.5H1.6 would be subverted, and district courts would be free to disregard the guidelines when sentencing parents. See United States v. Carter, 122 F.3d 469, 474-75 (7th Cir. 1997). We held in Stefonek that circumstances more compelling than Watts's-- "unrebutted testimony that the learning problems of [the defendant's] child will be aggravated by her absence" (179 F.3d at 1038)--still do not justify a departure unless the record establishes not only that the harm "would be greater than the harm to a normal child" (ibid.) but also that care from other sources would be unable to alleviate that harm. Joshua is a normal child; almost by definition his normal reaction cannot justify a departure. See also United States v. Sweeting, 2000 U.S. App. Lexis 8678 (3d Cir. May 3, 2000).

What is more, nothing in the psychologist's report suggests that reducing his mother's sentence from 235 months to 170 months would do the slightest good for Joshua. The psychologist did not try to assess the difference (if any) to a seven-year-old child between knowing that his mother will be gone until he is 19 (a 170-month sentence less 15% good-time credits) and knowing that his mother will be gone until he is 24 (a 235-month sentence less credits). Rare is the youngster who can appreciate the difference between two months and two years into the future. We doubt that Joshua's mental health and educational prospects could be measurably improved by knowledge that his mother will be released when he is 19 rather than five years later. In either case the parental bond and support are sundered, and someone other than his mother must raise the child to maturity. (In Joshua's case, that "someone" will be Deniese's sister.)

Reducing a sentence to assist a child's development makes most sense when the range is low to begin with and a small departure allows the parent to provide continuing care. For example, a defendant whose offense level is in Zone B of the sentencing table could be given probation (or home confinement) rather than incarceration with only a small downward departure. See United States v. Galante, 111 F.3d 1029, 1031 (2d Cir. 1997); United States v. Haversat, 22 F.3d 790, 797-98 (8th Cir. 1994); United States v. Sclamo, 997 F.2d 970, 972-74 (1st Cir. 1993); United States v. Gaskill, 991 F.2d 82 (3d Cir. 1993); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991). But taking a few years off a long sentence is worthless to children and costly to the program of proportionate punishment under the guidelines.

Deniese herself would be the sole beneficiary of this sentence reduction. The only case we could find approving a family-circumstances reduction in a sentence that remained hefty is our own United States v. Owens, 145 F.3d 923, 926, 928-29 (7th Cir. 1998), but in Owens the parties did not discuss the fact that even after the reduction the defendant could not assist his family for a decade. Today we conclude that a downward departure for extraordinary family circumstances cannot be justified when, even after reduction, the sentence is so long that release will come too late to promote the child's welfare.

With respect to Wright the judgment is affirmed. With respect to Watts the conviction is affirmed but the sentence is vacated, and the case is remanded for resentencing within the range for offense level 38.