**UNITED STATES of America, Plaintiff,**

v.

**Shahira Hamideh JEBARA, Defendant.**

No. 03–CR–46.

United States District Court, E.D. Wisconsin.

April 5, 2004.

Stephen A. Ingraham, Milwaukee, WI, for Plaintiff.

Juel Kaplan, Miami, FL, for Defendant.

## *MEMORANDUM*

ADELMAN, District Judge.

## I. BACKGROUND

Defendant Shahirah Jebara ("defendant") was indicted as part of a conspiracy to commit mail and wire fraud. The scheme was masterminded by her husband, Abdel Jebara ("Jebara"), and involved the fraudulent redemption of more than $5,000,000 worth of coupons.[1] The parties agreed that defendant could not reasonably foresee the entire scope of the scheme her husband devised, *see* U.S.S.G. § 1B1.3(a)(1)(B),[2] and that she played a

1. The scheme worked this way: Jebara recruited various individuals to collect and cut thousands of coupons from newspaper inserts. He and other co-conspirators then recruited more than 300 "stores" (some of which were not actually retail stores) to fraudulently redeem coupons which had not actually been presented by customers making a purchase. Due to the volume of coupons redeemed in this country, manufacturers rely on "clearinghouses" to sort them and provide reimbursements. The scheme in the present case was assisted by an insider at one of the clearinghouses, who approved the fraudulent reimbursement applications submitted by the stores involved in the scheme.

2. In light of this agreement, the government conceded that it was unable to prove that the "loss amount" fairly attributable to defendant exceeded $1,000,000. *See* U.S.S.G. § 2B1.1(b)(1)(H) (providing 14 level enhancement for loss amount between $400,000 and $1,000,000).

"minor role" in effectuating it, *see* U.S.S.G. § 3B1.2. I accepted the parties' agreement and determined that her offense level under the guidelines was 16 (base level 6 + 14 for loss amount + 2 for number of victims—3 for role in the offense and—3 for acceptance of responsibility). Combined with a criminal history category of I (she had no prior record), defendant's imprisonment range was 21–27 months.

Prior to sentencing, defendant moved for a downward departure based on extraordinary family circumstances. Defendant is the mother of seven children, four of whom are minors (including an infant), and also cares for her two small grandchildren, ages two and three, while their mother (defendant's daughter Zeinab) works. Zeinab's husband has abandoned her and the children and left the country. Another adult daughter is pregnant and also expects to rely on defendant for child care while she works; her husband is charged in the present indictment and is expected to serve prison time. Defendant indicated that there was no one else who could step in and care for these children in her absence should she (and her husband—who also pled guilty and is awaiting sentencing) be sent to prison.

The government, while not opposing the motion, noted that defendant had various siblings living nearby who could possibly step in while she served a sentence. It suggested that defendant should have to exhaust these possibilities before she could obtain a departure. At the sentencing hearing, defendant presented evidence that these relatives could not shoulder the burden of caring for the younger children. The government then stated that a departure might be in order but that, in determining the extent of departure, I should consider the available family support structure.

After reviewing the evidence and hearing the arguments of counsel, I granted the motion and departed downward by four levels. This left defendant in Zone C of the sentencing grid and allowed a "split sentence" under U.S.S.G. § 5C1.1(d). Because the evidence showed that defendant's extended family could step in and provide child care for a limited duration, I imposed a sentence of five months imprisonment, followed by three years supervised release with a condition of five months home confinement. In this memorandum I set forth more fully the basis for my decision.

## II. DEPARTURE STANDARD

### A. General Standard

The court may depart from the guidelines if it finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. 18 U.S.C. § 3553(b). The Sentencing Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "discouraged" bases for departure, and "encouraged" bases for departure. *Koon v. United States,* 518 U.S. 81, 93–95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

■ A court confronted with a motion for departure should thus ask the following questions: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden, encouraged, or discouraged departures based on those factors?

If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into

account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (internal citations and quote marks omitted).

## B. Family Circumstances

■ Section 5H1.6 of the guidelines provides that family ties and responsibilities "are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6 (2003). Thus, this is a disfavored basis for departure, and the court may rely upon it to depart only if the defendant's situation is unusual or extraordinary. *See, e.g., United States v. Canoy,* 38 F.3d 893, 907 (7th Cir.1994); *United States v. Norton,* 218 F.Supp.2d 1014, 1018 (E.D.Wis.2002).

■ The Seventh Circuit has bluntly stated that: "Imprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children." *United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999); *see also United States v. Wright,* 218 F.3d 812, 815 (7th Cir.2000) (noting that it is expected that children will suffer when a parent goes to

prison). Thus, the court may depart only if the harm to the defendant's children would be greater than the harm normally incident to parental incarceration and care from other sources would be unable to alleviate that harm. *See Wright,* 218 F.3d at 815; *see also Canoy,* 38 F.3d at 907 (holding that the defendant must show that "the period of incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to family and parental relationships that would be present in the usual case"). In order to determine whether this standard is met and, if it is, whether a departure should be granted, courts have typically considered three factors.

First, the court considers the specifics of the family situation: the number of dependants the defendant has, the responsibility she has for them, and the role she plays in their lives; whether the dependents have any special needs and the defendant's role in meeting those needs; whether there are others who could replace the defendant in the dependents' lives; and whether the defendant's absence would force the family onto public assistance or the children into state custody. *Norton,* 218 F.Supp.2d at 1019 (collecting cases).[3]

■ Second, the court should consider the purposes of sentencing: the need for just punishment, protection of the public, general and specific deterrence, and rehabilitation of the defendant. "If the nature of the offense and the character of the defendant tend to show that no end other than punishment will be served by the term of imprisonment set by the guidelines, if there is no threat to the communi-

---

3. As then-Chief Judge Breyer once noted: "It may not be unusual, for example, to find that a convicted drug offender is a single mother with family responsibilities, but, at some point, the nature and magnitude of family responsibilities (many children? with handi-caps? no money? no place for children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary." *United States v. Rivera,* 994 F.2d 942, 948 (1st Cir.1993).

ty, and if society will ultimately benefit by allowing the defendant to care for his family, a departure may be proper." *Id.* at 1020 (citing *United States v. Gaskill,* 991 F.2d 82, 86 (3d Cir.1993); *United States v. Pena,* 930 F.2d 1486, 1494 (10th Cir.1991)).

■ Third, the court should consider whether the guideline range is such that a reasonable departure would spare the defendant's family from unnecessary hardship. A departure cannot be justified when, even with the reduction, the sentence is so long that the defendant's release will come too late to assist the family. *Id.* (citing *Wright,* 218 F.3d at 815–16).

The Commission recently amended § 5H1.6 to provide additional guidance in the consideration of such departures. The new guideline largely tracks the above considerations developed by the courts but provides further refinement. The revised application note provides:

(A) *In General*—In determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:

  (i) The seriousness of the offense.

  (ii) The involvement in the offense, if any, of members of the defendant's family.

  (iii) The danger, if any, to members of the defendant's family as a result of the offense.

(B) *Departures Based on Loss of Caretaking or Financial Support*—A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-ex-

haustive list of circumstances in subdivision (A), the presence of the following circumstances:

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv) The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6 cmt. n. 1 (2003).[4]

## III. DISCUSSION

■ The evidence showed that defendant was the glue that held her family together. It was clear that a sentence within the guideline range would cause her family to collapse and create needless suffering. Because so many people depended

4. Amended § 5H1.6 went into effect on October 27, 2003, after the completion of the instant offense. However, the amendment appears to be clarifying rather than substantive, and the parties agreed that it (along with the rest of the 2003 version of the guidelines) applied in the present case. *Cf. United States v. Mansoori,* 304 F.3d 635, 673 n. 13 (7th Cir.2002), *cert. denied,* 538 U.S. 967, 123 S.Ct. 1761, 155 L.Ed.2d 522 (2003).

upon her for fundamental needs, a departure was warranted. However, because the evidence showed that defendant's family could survive a short-term absence, and because a prison sentence was called for based on the seriousness of the offense, I declined to depart to Zone B, as defendant requested.

## A. Specifics of the Family Situation

Defendant has seven children:

- Medre, age 21, who is also charged in the present indictment;
- Zeinab, age 20, who is divorced with two children, ages two and three;
- Saidah, age 19, who is married and six months pregnant; her husband is also charged in the indictment;
- Safah, age 17, a high school senior who plans to attend college in the fall;
- Ula, age 16, a student;
- Shahrazad, age 11, a student; and
- Doniazad, age 8 months.

All of defendant's children live with her in a three bedroom apartment in Yonkers, New York.[5] Defendant cares for her minor children full-time. She also cares for Zeinab's two children while Zeinab works. Zeinab's husband abandoned his family and left the country, leaving them with no source of support save what Zeinab can earn through her employment. Saidah also expects defendant to provide child care after she gives birth. Saidah will have to work to support herself and her child, as her husband, also a co-defendant in this case, may be going to prison. Defendant has never been employed; she has

devoted her life to raising her children, and now, assisting to raise her grandchildren. Basically, defendant cooks, washes, cleans and shops for her family all day.

Removing defendant from her family for the duration called for by the guidelines would do serious harm to this family. No one is available to step in and do what she does. First, defendant's husband has only lived with her and his children sporadically; he has no experience in childcare. In particular, his ability to care for the infant is highly dubious. He also works full-time in order to support the extended family. But more importantly, he has pleaded guilty to this offense and will likely be sentenced to prison before the end of the year. He could not possibly care for the children if defendant were imprisoned to a guideline sentence as he will likely be serving his own sentence for an overlapping period. The same is true with Medre.

Second, defendant's older daughters could not combine to care for the children while defendant served a guideline sentence without doing serious financial harm to the family. As noted, Zeinab's husband has left the country and provides no financial support to her or the children. She must continue to work in order to help support the family, which survives on her salary, plus the contributions of Medre and Jebara. And, as noted, Medre and Jebara have been convicted based on their involvement in this offense and likely will be sent to prison before the end of the year. This will leave Zeinab and Saidah to earn enough to make ends meet; they could not do this if forced to watch children all day.[6]

---

5. Despite the size of this fraudulent scheme, the evidence showed that very little of the money made its way to defendant and her children. It appears that most of the funds went to co-conspirators and into the construction costs of a house Jebara had built in the West Bank of Palestine. Further, for much of the scheme's duration, Jebara did not live with his wife and children.

6. Safah is approaching adulthood. However, she plans to leave home to attend college in the fall. The guidelines should not require that this young woman's life be kept on hold because of the crimes of her mother and father. Ula is still in high school and Shahrazad in middle school; they could not care for an infant for several years.

Third, while defendant has various siblings in the area, the evidence showed that none could reasonably step in and care for four children under the age of three, including an infant, while defendant served a sentence under the guideline range.

Defendant has eight living siblings: [7]

- Samira Kahlil, age 49, is widowed with seven children, lives in Yonkers, and works full-time as a lab technician;
- Aida Alfaqih, age 47, is married with six children, resides in Yonkers and is disabled from polio;
- Ali Hamideh, age 45, is married with three children, resides in Yonkers and works full-time;
- Amira Kahlil, age 41, is married with six children, lives in Buffalo and owns a linen store;
- Muhammad Hamideh, age 39, is married with five children, lives in Yonkers and works as a taxi driver;
- Ahmad Hamideh, age 37, is married with four children and lives in Jordan;
- Hamiza Hamideh, age 35, is incarcerated in New York state prison for unlawful purchase of a firearm; and
- Abbas Hamideh, age 33, is married with five children, resides in Yonkers and works as a security guard.

Certain siblings are quickly disqualified from assisting: Aida is disabled, with six children of his own to attend to; Amira lives in another city, has six children of her own, plus a business to run; Muhammad is charged in the indictment and facing prison; Ahmad lives in another country; and Hamiza is in prison. As the government noted in its pre-sentencing submission, this left three siblings who could potentially step in. However, at the hearing, defense counsel made an offer of proof—with the three siblings present and prepared to testify—that they were unable to assume defendant's awesome responsibilities should she receive a sentence within the guidelines.

Abbas has five children under the age of 7, the youngest one year old. One of his children has a disability and requires extra attention. Abbas lives with his wife and children in a two bedroom apartment and works long hours. Given the restraints of time, resources and living space, Abbas simply could not take in defendant's children. Ali is married with a five month old baby. However, his relationship with his wife is strained and they have separated several times. He also works full-time. He could not provide a stable home for defendant's children, nor care for them without his wife's assistance, which is lacking. Samira is widowed and works full-time to support herself. She is employed as a lab technician and absent from her home for long stretches of time. She has plainly indicated that she cannot handle a baby. Thus, none of defendant's siblings could reasonably replace her for the duration of a guideline sentence.

Based on all of this evidence, I concluded that defendant's family situation was extraordinary, and that she was essentially irreplaceable. Given its financial and child care demands, this family is precariously balanced, and defendant is the fulcrum. The family would suffer a substantial loss of essential care-taking if she were imprisoned under the guidelines. U.S.S.G. § 5H1.6 cmt. n. 1(B)(i). No reasonable alternatives were available, leaving the youngest children to be split up and possibly taken into state custody, including the infant Doniazad. *See id.* n. 1(b)(iii). This far exceeds the harm normally incident to a parent's imprisonment. *See id.* n. 1(ii).

## B. Seriousness of the Offense

The offense was serious, causing a loss of over $5,000,000 to the clearinghouse and

---

**7.** A sister, Sinai, died seven years ago from cancer.

manufacturers. *See* U.S.S.G. § 5H1.6 cmt. n. 1(A)(i). Nevertheless, this did not warrant denial of the motion. First, while the overall scheme was large, defendant did not reasonably foresee its scope, and the government agreed that she should be held accountable under U.S.S.G. § 2B1.1(b)(1) for a loss figure of just $400,000. The parties also agreed that she should receive a reduction for mitigating role under § 3B1.2.[8]

Second, other members of defendant's family were involved in the offense, *see* U.S.S.G. § 5H1.6 cmt. n. 1(A)(ii), but under the circumstances of this case, that strengthened her motion. The strong possibility that these relatives would be sent to prison only increased defendant's importance to the rest of the family.[9]

Third, no family member was placed in danger as a result of the offense. *See* U.S.S.G. § 5H1.6 cmt. n. 1(A)(iii). Further, there was no evidence that defendant presented a danger. She has no prior record, there was no hint of violence in this case, and defendant's role was basically to pass on instructions from her husband.

Because defendant's family situation was extraordinary and the nature of her offense did not reflect a threat to the community, I concluded that a departure was warranted.

## C. Extent of Departure

■ Once the court decides to depart, the extent of departure is a matter within its discretion. However, the departure must be reasonable and tied to the structure of the guidelines. *Norton*, 218 F.Supp.2d at 1022. Further, in a case such as this, the departure must effectively address the loss of care-taking or financial support. U.S.S.G. § 5H1.6 cmt. n. 1(B)(iv); *see also Wright*, 218 F.3d at 815–16.

■ Defendant asked that I depart down to Zone B and impose a sentence of probation. However, it would have taken a six level departure to reach Zone B. I concluded that this extent of departure would be too great, would unduly depreciate the seriousness of the offense, and would fail to take into account the familial resources defendant had. Instead, I found that a four level departure was reasonable. *See Norton*, 218 F.Supp.2d at 1022. This landed defendant in Zone C, allowing a split sentence of five months imprisonment followed by five months of home confinement as a condition of supervised release. *See* U.S.S.G. § 5C1.1(d)(2).

Not all departures for extraordinary family circumstances must result in a sentence of probation. In *Wright* the Seventh Circuit stated:

> Reducing a sentence to assist a child's development makes most sense when the range is low to begin with and a small departure allows the parent to provide continuing care. For example, a defendant whose offense level is in Zone

---

8. The government advocated a two level reduction, while the defense argued for four levels. I concluded that because defendant's role fell between "minimal" and "minor" a three level reduction was appropriate. Essentially, defendant's role was to pass on certain information from her husband to female co-conspirators (it is traditional in Arab society for men to talk "business" with men, and women to talk "business" with women) and to drive him on errands because he did not have a driver's license.

9. It is unclear what the Commission intended with this addition to the application note. Perhaps it intended to disfavor departures when the defendant conspired with family members to commit crimes (that sort of relationship is not worthy of a departure). But most departures on this basis are designed to avoid causing harm to vulnerable dependents, usually children. Minor children are not usually co-conspirators.

B of the sentencing table could be given probation (or home confinement) rather than incarceration with only a small downward departure.

218 F.3d at 815. However, the court said this in the context of reversing a departure that reduced the defendant's sentence from 235 to 170 months. The court held:

> [T]aking a few years off a long sentence is worthless to children and costly to the program of proportionate punishment under the guidelines. [The defendant] herself would be the sole beneficiary of this sentence reduction.... Today we conclude that a downward departure for extraordinary family circumstances cannot be justified when, even after reduction, the sentence is so long that release will come too late to promote the child's welfare.

*Id.* at 815–16.

■ *Wright*'s holding is not that a departure must result in probation; it is that the departure must reasonably provide for the welfare of the defendant's family, not merely shorten the sentence for her benefit.[10] Or as the Commission has stated: "The departure [must] effectively ... address the loss of caretaking or financial support." U.S.S.G. § 5H1.6 cmt. n. 1(B)(iv).

In the present case, a five month sentence was not too long to promote the welfare of the children and also had the virtue of providing just punishment. First, the evidence showed that defendant's family could adequately care for the children for five months. Defendant's husband and adult son are co-defendants, but are currently free on bond and likely will be for the rest of the year. They, along with defendant's adult daughters, can step in for five months. With a five month sentence, defendant will likely be released by the time her husband and son are required to begin their sentences. She will also be released around the time Safah is to leave home for college; Safah can assist over the summer. No one can truly replace defendant in the life of her infant, and this set up is not optimal; but it is adequate. Thus, I concluded that this departure effectively addressed the loss of care-taking support, because the family can manage for that period of time.

Second, a sentence of imprisonment served the goals of promoting respect for the law and providing just punishment. For those in defendant's position, a prison sentence of this length is likely a strong deterrent to criminal conduct. Those involved in schemes of this size, even when their involvement is peripheral, should expect to go to prison.

## IV. CONCLUSION

Thus, for the reasons stated, I granted defendant's motion and departed downward to Zone C, imposing a split sentence. This sentence adequately took into account defendant's extraordinary family situation without unduly depreciating the seriousness of the offense or overlooking the available family resources.

---

**10.** This is consistent with the primary reason for this departure: to prevent "third party harm." *Norton,* 218 F.Supp.2d at 1019 n. 2.