UNITED STATES of America,
Plaintiff,

v.

Angelique M. EISINGER, Defendant.

No. 03–CR–107.

United States District Court,
E.D. Wisconsin.

June 9, 2004.

Carol Kraft, Milwaukee, WI, for Plaintiff.

Patrick Cafferty, for Defendant.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Defendant Angelique Eisinger pled guilty to a charge of possession of ephedrine with intent to facilitate the manufacture of methamphetamine. A pre-sentence report (PSR) was prepared in anticipation of sentencing, which calculated her offense level as 12 and her criminal history category as III, producing an imprisonment range of 15–21 months. Neither party objects to these calculations, but defendant moves for a downward departure based on (1) her extraordinary post-offense rehabilitation, (2) her extraordinary family circumstances, and (3) the over-representation of the seriousness of her criminal history and the likelihood that she will re-offend by her designated criminal history category. In this decision I address her requests.

## I. VERTICAL DEPARTURE REQUESTS

Defendant's motions based on post-offense rehabilitation and family circum-

stances both seek "vertical" departures on the sentencing grid, i.e. reductions in offense level. The court may depart vertically if it finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0(a). The Sentencing Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "discouraged" bases for departure, and "encouraged" bases for departure. *Koon v. United States*, 518 U.S. 81, 93–95, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1995). In *Koon*, the Supreme Court adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual? (2) Has the Commission forbidden, encouraged or discouraged departures based on those factors?

> If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland.

*Id.* at 95–96, 116 S.Ct. 2035 (internal citations omitted).

## A. Post–Offense Rehabilitation

### 1. Departure Standard

Defendant first argues that her case falls outside the heartland because, since the commission of the offense, she has successfully undergone drug treatment, given birth to a healthy child, and essentially turned her life around. This suggested ground for departure is referenced in U.S.S.G. § 3E1.1, which provides for an offense level reduction for acceptance of responsibility. In deciding whether to grant such a reduction, a court may consider the defendant's "post-offense rehabilitative efforts." U.S.S.G. § 3E1.1 cmt. n. 1(g). Thus, courts have generally concluded that a departure is permitted on this basis only if the defendant's efforts are exceptional enough to be considered atypical of the cases in which the acceptance-of-responsibility reduction is usually granted. *See, e.g., United States v. Chapman*, 356 F.3d 843, 848–49 (8th Cir.2004); *United States v. Smith*, 311 F.Supp.2d 801, 804 (E.D.Wis.2004); *United States v. Jones*, 233 F.Supp.2d 1067, 1070–71 (E.D.Wis. 2002) (collecting cases).

██ Courts considering such departures have often focused on drug and alcohol treatment. *See, e.g., United States v. Maier*, 975 F.2d 944, 945 (2d Cir.1992); *United States v. Logan*, No. 02–CR–440, 2004 WL 417341, *4, 2004 U.S. Dist. LEXIS 1201, at *10–12 (N.D.Ill. Feb 2, 2004). But other factors, such as community involvement, family counseling and reconciliation, psychiatric treatment, steady employment, and compliance with conditions of pre-trial release have also been considered. *Jones*, 233 F.Supp.2d at 1071 (collecting cases). Whatever the specifics, the evidence must show that the defendant has made concrete gains in turning her life around before a sentencing court may properly rely on rehabilitative efforts as a basis for a downward departure. *Id.*

## 2. Defendant's Motion

In the present case, the evidence shows that defendant has made a remarkable transformation and appears to have succeeded in turning her life around. In order to appreciate where defendant is now, the court must analyze from where she came.

Defendant was born on March 10, 1983, in Camden, New Jersey. Her parents never married, and defendant has never known her father. Her childhood was chaotic. When she was about eight years old, her mother moved the family from New Jersey to Holdingford, Minnesota. They lived there for about two years before moving to Roscoe, MN. At the age of 16, defendant moved to Sartell, MN to live with her maternal grandmother. She stayed there for a short period of time before moving to Stearns County, MN with her mother.

Defendant's mother was involved with various men during this time and has had six children with four different men. According to defendant, her mother has made poor choices in her relationships. Defendant's mother is also an alcoholic and suffers from a chemical imbalance, which at times has caused her to be mentally unstable. Defendant states that her mother's boyfriends were occasionally abusive, and at times they were forced to seek refuge in women's shelters. At one point, when defendant was 16, her mother was committed to a mental hospital, as a result of which the family lost its apartment and had to live in a homeless shelter.

When defendant was 18, she left her mother's home; she moved from place to place in central Minnesota until she met Travis Kresbach, who became her boyfriend, in early 2003.

Defendant's employment history during this time was spotty, at best. She worked as a cashier at a grocery store for two weeks in October 1999, before walking away without notice. She was employed as a part-time clerk at a Hardee's restaurant in Minnesota for about four months in the Spring of 2000, but quit after going on a drinking binge. In September 2000, she worked part-time as a dishwasher at a restaurant for about one month before quitting without notice. Defendant states that she ran away from home at that time and left her job behind. Defendant next worked as a server at a restaurant in February and March 2001 before quitting because she was moving. She then supported herself as an exotic dancer for a few months. She states that she took that job because she had no money, nowhere to stay, and needed money to maintain her growing methamphetamine habit. Defendant was then unemployed from late 2001 until her arrest in May 2003. She supported herself by swapping drugs for food and shelter.

In February 2003, Kresbach and defendant moved from Minnesota to Kenosha, Wisconsin. Kresbach began cooking methamphetamine in an apartment he shared with defendant and a man named Charles Mohs. Later, the operation was transferred to a storage unit in a Kenosha storage facility. Some of the methamphetamine was for the personal use of the three, but some Kresbach sold to individuals who traveled from Minnesota. Defendant's role was to assist by purchasing quantities of ephedrine, which is a precursor of methamphetamine. Mohs helped Kresbach set up the laboratory in the storage unit.

On May 5, 2003, DEA agents executed a search warrant at the storage facility and discovered the methamphetamine laboratory. Kresbach was arrested and admitted to manufacturing 21 to 23 grams of methamphetamine, the majority of which he sold to subjects from Minnesota.

Defendant also admitted her role. She stated that she would go to local drug stores and purchase over the counter products such as Sudafed or Actifed, which contained ephedrine. She stated that she obtained these products for the others because she wanted to get high on methamphetamine. "It was all to get high," she said. At the time of her arrest, defendant was a skeletal 103 pounds at a height of 5'10".

Defendant's substance abuse began at the age of 15, when she started consuming alcohol. She would drink to the point of intoxication about every other day. Defendant began using marijuana at the age of 16, smoking every other day unless she was unable to obtain the drug. She also experimented with smoking cocaine on several occasions.

Beginning at the age of 18, defendant began using methamphetamine. At first, she used twice per week. Eventually, she progressed to daily consumption. In the months before her arrest, she was using about one gram per day. Her weight dropped from 128 to 103 pounds, her teeth began to chip and she started experiencing breathing problems.

A criminal complaint was filed on May 8, 2003, charging defendant, Mohs and Kresbach with conspiracy to manufacture and distribute methamphetamine. On that date, defendant appeared before Magistrate Judge Callahan and was temporarily detained. On May 14, she was released with the condition that she reside at the Genesis Residential Treatment Program. On June 19, 2003, a violation report was filed with Judge Callahan, indicating that she had forbidden contact with Kresbach. However, it was soon learned that defendant was pregnant with Kresbach's child and her conditions of release were modified to allow contact. Defendant has had no violations of the conditions of pre-trial release since that time.

On July 28, 2003, defendant appeared before me and pleaded guilty to an information charging her with possession of ephedrine with the intent to facilitate the manufacture of methamphetamine.

Defendant was a resident at Genesis from May 14, 2003 to December 13, 2003. She participated in individual and group counseling sessions, completing the 30, 60, 90 and 120 day treatment plans prescribed for her. Defendant's counselor at Genesis, Nina Ball, reported that defendant did "remarkably well." She was consistent with her feedback to others and received information very well. She was an active participant in group and individual sessions. Ms. Ball stated that defendant "was a role model for the other residents." During her stay at Genesis, defendant was subjected to random urinalysis testing as well as random breath testing for alcohol. All of her tests were negative. Her discharge summary indicated that she had "developed an understanding of her substance abuse and criminal thinking patterns and identified alternative courses of action."

Defendant was also referred to the Certified Nurse–Midwife program through St. Michael Hospital for pre-natal care. She maintained monthly appointments with her midwife, attended group pre-natal care sessions, and took all prescribed pre-natal vitamins.

Defendant was discharged from Genesis on December 13, 2003, and gave birth to a son, Bradley, at St. Michael Hospital. Despite concerns due to defendant's previous drug abuse, Bradley was born healthy. After her discharge from the hospital, defendant was permitted to re-locate to Cold Spring, Minnesota, where she has since resided with Kresbach's parents and her child. Defendant has stated that she plans to give temporary custody of Bradley to Mark and Sharon Kresbach if she is required to serve a prison sentence.

Since re-locating to Minnesota, defendant has continued with her recovery, attending weekly AA meetings and seeking a sponsor for NA meetings. She has reported to the Effective Living Center in St. Cloud, MN for urinalysis testing; all tests have been negative. She continues, voluntarily, to have contact with her counselors at Genesis.

Defendant has also taken steps to resume her education. She simply stopped going to school in the 10th grade because her living situation was so unstable. However, since moving in with the Kresbachs in Minnesota, she has begun studying for her GED exams and explored attendance at St. Cloud Technical College.

Further, defendant has secured part-time employment as an office assistant and secretary for Aggressive Builders in Foley, MN. Her supervisor indicates that she is reliable, averaging one to three days per week as needed. There is a possibility of full-time work depending on the outcome of this case.

Defendant also states that she and her mother have renewed their relationship. Defendant notes that her mother has been sober for about four years and has been taking prescribed medication. As a result, her relationship with defendant has improved. Defendant reports that her mother has been very supportive of her efforts in drug treatment.

Defendant indicates that she and Kresbach are engaged and will marry upon completion of their sentences. Kresbach received a sentence of 48 months in prison.

Overall, defendant's attitude is reflected in her statement to the probation officer that in the end, when she is done serving her sentence, she will look back and understand that it was for the best. She stated that she wanted to stop using and get into treatment, but could not do it on her own.

■ Based on all of these facts, I conclude that defendant's transformation has been extraordinary. The first and most important aspect of the transformation concerns defendant's efforts at drug treatment. Defendant completed a six month stay at Genesis, which offers a highly respected drug treatment program, one regularly used in this district. *See United States v. Lange*, 241 F.Supp.2d 907, 911 (E.D.Wis.2003). She completed her treatment plans, with her counselor reporting that she did "remarkably well" and was a "role model" for other residents. All of defendant's drug tests have been negative, even after leaving Genesis. It is well-documented that relapses during recovery are common. *See Maier*, 975 F.2d at 945. That defendant has remained totally clean after suffering from such a terrible addiction is remarkable. *See Lange*, 241 F.Supp.2d at 911. Defendant has continued to further her recovery since her release from Genesis with AA. It is important for this type of departure to note that defendant has continued to do well even after leaving a structured environment. *See United States v. Perella*, 273 F.Supp.2d 162, 170 (D.Mass.2003); *Lange*, 241 F.Supp.2d at 911. It is clear that her recovery is not one motivated solely by court-ordered conditions of release. Further, since entering treatment defendant has undergone a remarkable physical transformation. When she arrived in court she weighed just 103 pounds and was in failing health. She is now at an appropriate weight and appears the picture of health.

The second aspect of defendant's transformation has to do with her child. When she learned that she was pregnant, defendant did everything she could to ensure that her child would be born healthy. She complied with the Certified Nurse–Midwife program, made all of her appointments, and took all prescribed pre-natal vitamins. Bradley was born healthy, and

defendant appears to have become a good mother. She has established a stable home for her child and, responsibly, made arrangements for him should she be sent to prison. For someone raised under the chaotic conditions defendant was, and battling a strong drug addiction, defendant's efforts to be a good mother are extraordinary. Defendant has also reconnected with her own mother, a sign that family is important at this point in her life. Finally, I note that defendant has plans for the future—to marry Kresbach and provide a stable family for her child. Although Kresbach's drug involvement is some cause for concern, as it could perhaps lead to a relapse on defendant's part, the fact that defendant is thinking about the future is surely a positive sign. I also note that Kresbach has assured the PSR writer of his desire to be drug free, and that his sentence included a recommendation for the 500 hour drug treatment program and a drug after-care condition as part of supervised release. Thus, he will be undergoing treatment as well. Hopefully, he and defendant can bolster one another in this regard.

The third aspect of defendant's transformation is her acquisition of employment and plans to continue her education. As noted, defendant never held a steady job, but she now does and is well-regarded by her employer. After quitting school in the 10th grade, her interest in renewing her education also bodes well for the future. Again, these are the actions of someone committed to turning her life around.

■ Because defendant's efforts at self-improvement and rehabilitation are atypical of those who usually receive the § 3E1.1 reduction, and because those efforts reflect someone much less likely to re-offend, a sentence different from that called for under the guidelines should be imposed. Once a court decides to depart the extent of the departure is a matter

within the court's discretion and will be upheld so long as it is reasonable and adequately reflects the structure of the guidelines. While there are no hard and fast rules to govern the extent of a departure, the Seventh Circuit has approved a method that involves calculating the defendant's sentence by analogy to existing guideline provisions. *Jones,* 233 F.Supp.2d at 1073 (citing *United States v. Cruz–Guevara,* 209 F.3d 644, 647–48 (7th Cir.2000)). I will grant defendant a three level departure on this basis, which equals the reduction allowed by § 3E1.1 and provides sufficient reward without unduly depreciating the seriousness of the offense.

## B. Family Circumstances

### 1. Departure Standard

■ Defendant's second ground for departure is her family circumstances. U.S.S.G. § 5H1.6 provides that family ties and responsibilities "are not ordinarily relevant in determining whether a departure may be warranted." Thus, this is a disfavored basis for departure, and the court may rely upon it to depart only if the defendant's situation is unusual or extraordinary. *See, e.g., United States v. Canoy,* 38 F.3d 893, 907 (7th Cir.1994); *United States v. Norton,* 218 F.Supp.2d 1014, 1018 (E.D.Wis.2002).

■ The Seventh Circuit has bluntly stated that: "Imprisoning the mother of a child for even a short period of time is bound to be a wrenching experience for the child, but the guidelines do not contemplate a discount for parents of children." *United States v. Stefonek,* 179 F.3d 1030, 1038 (7th Cir.1999). Thus, the court may depart only if the harm to the defendant's children would be greater than the harm normally incident to parental incarceration and care from other sources would be unable to alleviate that harm. *See United States v. Wright,* 218 F.3d 812, 815 (7th Cir.2000); *Canoy,* 38 F.3d at 907.

In order to determine whether this standard is met and, if it is, whether a departure should be granted, courts have typically considered three factors.

 First, the court considers the specifics of the family situation—the number of dependents the defendant has, the responsibility she has for them, and the role she plays in their lives; whether the dependents have any special needs and the defendant's role in meeting them; and whether there are others who could replace the defendant in the dependents' lives. *Norton,* 218 F.Supp.2d at 1019 (collecting cases). Second, the court should consider whether the guideline range is such that a reasonable departure would spare the defendant's family from unnecessary hardship. A departure cannot be justified when, even with the reduction, the sentence is so long that the defendant's release will come too late to assist the family. *Id.* at 1020 (citing *Wright,* 218 F.3d at 815–16). Third, the court should consider the purposes of sentencing, including the need for just punishment, the need for deterrence, protection of the public, and the rehabilitation of the defendant. If the nature of the offense and the character of the defendant tend to show that no end other than punishment will be served by imprisonment, if there is no threat to the community, and if society will ultimately benefit by allowing the defendant to care for his or her family, a departure may be warranted. *Id.*

The Commission recently amended § 5H1.6 to provide additional guidance in the consideration of such departures. *United States v. Jebara,* 313 F.Supp.2d 912, 915–16 (E.D.Wis.2004). Of significance in the present case is the Commission's statement that:

A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires ... the presence of the following circumstances:

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.

(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv) The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6 cmt. n. 1 (B).

**2. Defendant's Motion**

 Defendant's situation is compelling in the sense that she is the mother of an infant whose father is also incarcerated. However, cutting against her argument is the fact that defendant can leave Bradley with his grandparents, the Kresbachs, while she serves a prison term. In any event, because I have already granted a three level reduction based on the first motion (which, in conjunction with a horizontal departure to be discussed, will address the family situation), I will award no further departure on this basis. Thus, while this ground for departure is one within my discretion, I will decline to exercise my discretion to depart under the circumstances.[1]

1. Courts have granted departures to the parents of infants, *e.g., United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992); *United*

*States v. Pena,* 930 F.2d 1486, 1493 (10th Cir.1991); *Norton,* 218 F.Supp.2d at 1020, but in those cases the defendant was typically

## II. HORIZONTAL DEPARTURE REQUEST

### A. Departure Standard

 Finally, defendant requests a horizontal departure from criminal history category III to category I under U.S.S.G. § 4A1.3. Unlike vertical departures under § 5K2.0, horizontal departures do not require the court to find the case extraordinary. *United States v. Hammond*, 240 F.Supp.2d 872, 875–76 (E.D.Wis.2003). Rather, the court need only find that "reliable information" indicates that the defendant's criminal history category substantially over-represents (1) "the seriousness of the defendant's criminal history" or (2) "the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b)(1). Application note 3 provides an example of the type of situation that might warrant a horizontal departure:

> A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior

criminal behavior in the intervening period.

U.S.S.G. § 4A1.3 cmt. n. 3.

 This is but one example; other relevant considerations include the age of the prior offenses; the defendant's age at the time she committed them; whether the prior offenses were committed while the defendant was under the influence of drugs or alcohol; the circumstances of the defendant's prior convictions, i.e. whether they were petty or non-violent; the length of the prior sentences; what was going on in the defendant's life at the time she committed the prior offenses; and the closeness in time of the prior offenses, i.e. whether they were they part of one "spree." *Hammond*, 240 F.Supp.2d at 877. These factors help the court determine the basic question—whether the category assigned accurately reflects the defendant's past misconduct and the risk that she will re-offend in the future.

### B. Defendant's Motion

 I conclude that category III substantially over-represents the seriousness

responsible for a number of children and had no one to fall back on in the event of a guideline prison sentence. Thus, the defendant was "irreplaceable" in the sense that, if left without her, young children would likely have ended up in state custody. That would not happen in the present case. However, when considering the concept of irreplaceability, it may be appropriate to employ a different standard when the defendant is the mother of a newborn. Research suggests that if the "mother-child bond is disrupted between the ages of six months and four years, a child's development may be greatly effected." Leda M. Pojman, *Cuffed Love: Do Prison Babies Ever Smile?*, 10 Buff. Women's L.J. 46 (2001/2002) (citing American Medical Association, Council on Scientific Affairs, *Bonding Programs for Women Prisoners and Their Newborn Children*, Report 3 (I–97)). The consequences for these children are emotional as well as physical. *See Developments in Law: Alternatives to Incarceration*, 111 Harv. L.Rev.

1921, 1930–31 (May 1998) ("Infants will miss the critical time period for forming bonds with their mothers; this period of separation has serious developmental and behavioral consequences. Infants of incarcerated mothers face unique physical deprivations as well, as separation of infants from their mothers prevents breast-feeding."); *see also* Gordon G. Waggett and Rega Richardson Waggett, *Breast is Best: Legislation Supporting Breast Feeding is an Absolute Bare Necessity—A Model Approach*, 6 Md. J. Contemp. L. Issues 71 (1995) (discussing health advantages of breast feeding for child and mother, as well as benefits for society). I do not suggest an automatic "discount" for mothers with young children, which could conflict with the Seventh Circuit's *Stefonek* decision, only that courts must be sensitive to the consequences of the sentences they impose. Those consequences may be more severe when the child left parentless is of such a tender age.

of defendant's criminal history and the likelihood that she will re-offend.

### 1. Seriousness of Defendant's Criminal History

Defendant has four prior offenses which score criminal history points,[2] all extremely minor: (1) a conviction for shoplifting an ink pen and a lighter valued at $9.25 and $1.19, for which she received a $100 fine; (2) shoplifting a bracelet valued at $1.25, for which she received two days in jail and a $300 fine; (3) possession of drug paraphernalia, for which she received an $85 fine; and (4) possession of marijuana and paraphernalia, for which she received a combined $486 fine. This is not the sheet of the usual occupant of category III. Most category III defendants seen by this court have at least one serious felony conviction. Indeed, because the category covers those with 4–6 points, a defendant could have two serious felony convictions—for which the sentence was measured in years—and be in the same category as this defendant with her four petty violations. None of defendant's priors reveal a propensity for dangerousness or willingness to harm others. Rather, they are properly called petty. Thus, I find that category III substantially overstates the seriousness of defendant's criminal history. *See, e.g., United States v. Wilkerson,* 183 F.Supp.2d 373, 381 (D.Mass.2002) (departing where defendant had no convictions for crimes of violence but mostly drug and motor vehicle offenses); *United States v. Wilkes,* 130 F.Supp.2d 222, 239–40 (D.Mass.2001) (departing to category I where defendant had only "two convictions for minor drug offenses" yet was placed in category III); *United States v. Lacy,* 99 F.Supp.2d 108, 119 (D.Mass.2000), *aff'd,* 16

Fed.Appx. 10 (1st Cir.2001) (departing where defendant's record was "largely non-violent, and relatively minor, the kind that characterizes an out-of-control addict"); *United States v. Hammond,* 37 F.Supp.2d 204, 205 (E.D.N.Y.1999) (departing from category VI to III where defendant "had no history of violent behavior [and his] prior arrests resulted from minor drug crimes involving facilitation of the sale of drugs and the kind of petty criminality associated with a poor addict's attempt to acquire money for the purchase of narcotics"); *United States v. Leviner,* 31 F.Supp.2d 23, 32–34 (D.Mass. 1998) (departing where defendant's priors were minor, mostly motor vehicle and possession charges, and non-violent).

### 2. Likelihood of Recidivism

■ At the time she committed these offenses, defendant was young, 19 or 20, and abusing drugs. Three of the four offenses were drug-related: two *were* drug offenses and it seems quite likely that the ink pen and lighter were stolen as drug paraphernalia. The prior offenses all occurred between April 2002 and March 2003, a period of time in which defendant was in the grip of a powerful addiction. Because, as detailed above, she has reformed herself and apparently overcome that addiction, defendant is at a much lower risk of re-offending than the typical category III defendant. *See Logan,* 2004 WL 417341, **3–6, 2004 U.S. Dist. LEXIS 1201, at *9–11 (departing horizontally where defendant's record resulted directly from drug addiction, and defendant had undergone treatment and become drug free).[3]

---

**2.** A fifth conviction for trespassing, for which defendant received a $300 fine, does not count under U.S.S.G. § 4A1.2(c)(1).

**3.** As Judge Kennelly noted in *Logan,* successful efforts at drug treatment may support a departure under both § 4A1.3 and § 5K2.0. *Id.* at *5–6.

Therefore, a horizontal departure is appropriate. However, I cannot conclude that a departure to category I is proper, as defendant requests. Defendant's record is minor in nature, but there are a total of five entries on it, one of which did not score due to its nature. It would not be proper to place her in the same category as those who have no record at all. Thus, I will depart to category II.

## III. CONCLUSION

In the 13 months that this case has been pending defendant has undergone a remarkable transformation, from a sickly, underweight drug addict to a healthy, responsible, sober mother and citizen. It may be no exaggeration to say that this prosecution saved her life and that of her child. But defendant's indictment only provided the opportunity for change; it was through her hard work and commitment that she has become a new person. She has earned downward departures from the guidelines as outlined above.

With these departures, defendant's offense level is 9 and her criminal history category is II. This places her in Zone B of the grid, with a range of 6–12 months, allowing a sentence of probation. U.S.S.G. § 5C1.1(c).

I sentence defendant to three years probation on count one. As a condition of probation, defendant shall comply with the conditions of home confinement for a period not to exceed six months. U.S.S.G. § 5C1.1(c)(3). Other conditions appear in the judgment.